J-A03007-22

2022 PA Super 50

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GEORGE WILLIAMS | |
| Appellant | No. 1311 EDA 2020 |

Appeal from the Judgment of Sentence December 2, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0009727-2017

BEFORE:  STABILE, J., DUBOW, J., and MCCAFFERY, J.

OPINION BY STABILE, J.:                    **FILED MARCH 28, 2022**

Appellant, George Williams, appeals from his judgment of sentence of thirty to sixty years' imprisonment for involuntary deviate sexual intercourse with a child, aggravated indecent assault of a person under thirteen years of age, indecent assault of a person under thirteen years of age and unlawful contact with a minor.[1]  We hold that the trial court abused its discretion by permitting a supervisor from Philadelphia Children's Alliance ("PCA") to give expert testimony that it is common for child victims to "under-disclose" sexual abuse to PCA interviewers, where the PCA witness was not qualified as an expert to provide such testimony.  We uphold the trial court's discretion not to provide a "prompt complaint" instruction to the jury.  Accordingly, we vacate the judgment of sentence and remand for a new trial.

_____

[1] 18 Pa.C.S.A. §§ 3123(b), 3125(a)(7), 3126(a)(7), and 6318, respectively.

In September 2017, Appellant was charged with the above offenses. On October 3, 2019, following trial and several days of deliberations, the jury found Appellant guilty of all charges. On December 2, 2019, the court imposed sentence. Appellant filed timely post-sentence motions, which were denied by operation of law on June 24, 2020. This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

The trial court summarized the evidence adduced during trial as follows:

The victim was twelve years old when she testified at Appellant's jury trial. In August 2016, the victim, her mother, and her brother, who is five years older than the victim, moved into Appellant's apartment on Emlen Street in Philadelphia. The victim testified that she loved Appellant "like he was family." He was "like a father figure" and her mother's best friend.

The victim described an incident where she was lying on a couch in the apartment's living room when Appellant was positioned behind her on the sofa and started to touch her. Appellant touched the victim's buttocks, breasts, and "private area" as he reached his hands into her pants and rubbed her skin. She was ten years old when Appellant began to touch her inappropriately.

The victim testified about another incident, which occurred in her bedroom. On this occasion, when the victim woke up, Appellant was in bed with her and touching her. Appellant touched the skin of the victim's breasts and buttocks. She also stated that, on more than one occasion, when she was in her bedroom, Appellant "made [her] suck on his penis."

The victim also told the jury about a different episode when the victim sat on the couch in the apartment's living room, and Appellant pulled off her shorts and underwear. Then, Appellant licked the victim's vagina with his tongue and touched her vagina with his fingers. At the time, her mother and brother were not in the apartment because they were at a laundromat.

Later, the victim, her mother, and her brother moved out of Appellant's apartment and lived at Appellant's mother's house along with Appellant's sister and her children. While there, the victim told another child that Appellant "molested" her. Then, she told her mother about what Appellant did. Upon hearing about the incidents, the victim's mother cried and vomited. Her brother "sat there in shock," and someone called the police.

Philadelphia Police Officer Charles Durham testified that he met with the victim on May 24, [2017]. The officer testified,

> [S]he said that she was touched inappropriately ... underneath her dress on her vagina, and ... that she was being asked to perform oral sex as well.... [A]ll of the things that she was telling me ... happened about a month prior to me being called out to the residence and that it was a continuous action for approximately three months.

Colleen Getz, a manager of the forensic interview unit at the [PCA], testified for the Commonwealth. PCA is an independent, nonprofit child advocacy service which works with a team of individuals from the Department of Human Services, the police, local children's hospitals, and mental health services in Philadelphia. PCA brings all those organizations together to provide a joint response to allegations of child abuse. When she testified, Ms. Getz had been employed with PCA for nine years. She had conducted more than 2,300 forensic interviews, which are fact-finding, unbiased methods of questioning children. The forensic interview provides a "child with an opportunity to provide as [] cohesive a statement as possible without having to be questioned multiple times."

Ms. Getz confirmed that the victim was interviewed at PCA on June 6, 2017. Takeisha Allen conducted the interview but was no longer working at PCA on the date of Appellant's trial. When she interviewed the victim, Ms. Allen had worked at PCA for two years and had conducted about five hundred interviews. After Ms. Getz's testimony, the Commonwealth played a video recording of the victim's forensic interview at PCA.

The victim's brother, K.G., was seventeen years old when he testified at Appellant's trial. K.G. described the victim's relationship with Appellant as "creepy." K.G. explained, "[M]y

- 3 -

little sister was always laying on him in some form or shape. Just either laying on his side or laying next to him ...." The victim's brother stated that the interactions between Appellant and the victim "felt wrong."

Tamika Weaver, the victim's mother, confirmed that she and her children lived with Appellant in his apartment on Emlen Street. Ms. Weaver stated that Appellant's behavior never troubled her. After moving out of his apartment, Ms. Weaver learned of the incidents involving Appellant and her daughter.

Appellant's wife, Vivian Williams, testified that she never saw any inappropriate contact between the victim and Appellant.

Appellant testified on his own behalf and claimed that he did not molest, sexually assault, or inappropriately touch the victim.

Trial Court Opinion, 4/30/21, at 3-5 (record citations omitted).

We note several other important facts from the record. The alleged assaults took place between August 2016, when the victim and her family moved into Appellant's apartment, and April 2017, when the victim and her family moved out. According to the victim, Appellant began sexually abusing her shortly after her tenth birthday, December 22, 2016, and after he impregnated the victim's mother. N.T. 9/26/19, at 55. By that time, the victim had come to "love him like he was family" and view him as her "god-dad" and "father figure." N.T. 9/26/19, at 49-50. She did not report the assaults while she lived with Appellant because he had been hitting the victim's brother, and she did not want to get hit herself. *Id.* at 65. She also did not want to tell her mother, explaining, "She was pregnant and she . . . might not have been in the right state of mind for me to say anything to her." *Id.*

- 4 -

In April 2017, the victim moved with her family into Appellant's mother's residence. One month later, in May 2017, the victim reported the assaults to Appellant's niece. *Id.* at 70-71; N.T. 9/27/19, at 77-78. Even then, she was scared to report the incidents to her mother, because she was afraid that her mother "would lose her mind and hurt [Appellant] or get hurt." N.T. 9/26/19, at 72.

The victim gave markedly incomplete stories about Appellant's alleged sex acts during her interviews. She told the responding police officer only that Appellant had touched her inappropriately. *Id.* at 119-121. She described six specific incidents to a PCA investigator. N.T. 9/27/19, at 16-17. The victim claimed at trial that Appellant made her perform oral sex on him, N.T. 9/26/19, 51-64, but she did not make this claim to investigators in multiple pretrial interviews. *Id.* at 95. Moreover, she testified at a preliminary hearing in a manner that showed that she simply did not understand the requirement that she tell the truth in court. *Id.* at 83. She in fact testified that she would lie under oath if someone else told her to do so. *Id.*

Against this factual background, we describe the testimony by the PCA supervisor, Getz, in greater detail. On direct examination, Getz, a Commonwealth witness, testified about services provided by PCA, her training and responsibilities at PCA, the type and manner of questioning involved in a forensic interview of a minor victim of sexual abuse, the identity of the person

who interviewed the victim in the present case, and the date of the interview. The Commonwealth asked no other questions of Getz on direct examination.

On cross-examination, in response to questions from defense counsel, Getz testified that the person who interviewed the victim later obtained a new job, and that Getz had reviewed the report of the interview and the incidents described by the victim during the interview. Defense counsel asked Getz whether any of the "six specific incidents" that the victim described, "were [regarding Appellant] actually putting his penis in her mouth." N.T., 9/27/19, at 16-17. Getz answered, "To my understanding, no." *Id.* at 17.

On re-direct examination, the prosecutor asked, "[I]n your nine years of experience, is it unusual for a child to under-disclose at the PCA?" *Id.* at 21. Getz answered, "It is not." *Id.* The prosecutor asked, "Why?" *Id.* Defense counsel objected on the grounds that the question called for irrelevant and expert testimony. *Id.* at 21-22. The court overruled the objection. *Id.* at 22. Getz testified:

> Disclosure is a process, not a one-time event, and it can sort of run a full range of the spectrum. There are times when children are ready to disclose. This is what we call active disclosure, when something happens and the child makes an outcry and is ready to describe everything that has happened. There are times when children are in tentative disclosure. These are children who present where they may talk a little bit about something and wait and see what happens. Then they talk more and wait and see what happens and talk more. It's also not uncommon for these children to take something back that they already stated and then come back and say that was really true when they feel more comfortable. It's also very common for these children to deny that certain things happened. So children in this spectrum will talk about, yes, this piece happened but this piece didn't happen

and then later on down the line say, well, this did happen I just didn't want to talk about it at the time for a number of reasons. So it's very common that we see children who will disclose a little bit and then a little bit more and then a little bit more.

*Id.* at 22.

The Commonwealth rested, and the following re-cross examination took place:

[Defense counsel]: So what you're saying is that children's stories frequently change, right?

[Getz]:  Details of disclosure can change.

[Defense counsel]: Sometimes they come in with one story, right?

[Getz]: Yes.

[Defense counsel]: Then maybe a few months later they have a different story, right?

[Getz]: Yes.

[Defense counsel]: Maybe a few months later they've got some different details, right?

[Getz]: Yes.

[Defense counsel]: You don't always know if they're telling the truth?

[Getz]: That's not something the forensic interviewer decides.

*Id.* at 23.

At no time during Getz's testimony did the Commonwealth attempt to qualify her as an expert.  Nor did the trial court qualify Getz as an expert or instruct the jury that she was an expert.  *Id.* at 16-23; N.T. 10/1/19 (closing instructions and questions from jury); N.T. 10/2/19 (questions from jury).

Appellant raises the following issues in this appeal:

1. Whether the trial court erred in allowing testimony from a social worker about typical sexual assault victim responses and behaviors where that social worker had not been qualified as an expert witness, thereby violating Pa.R.E. 701, Pa.R.E. 702, and the Supreme Court's holding in *Commonwealth v. Jones*, 240 A.3d 881 (Pa. 2020)[?]

2. Whether the trial court erred in denying Appellant's request for a prompt complaint jury instruction despite the complainant's failure to disclose the allegations of sexual abuse for months even though she had moved out of Appellant's house for at least a month prior to the disclosure?

Appellant's Brief at 7.

In his first argument, relying principally on *Jones*, Appellant contends that the trial court erroneously permitted Getz, a lay witness employed by PCA, to give expert testimony about whether child victims of sexual assault under-disclose sexual abuse. The trial court and the Commonwealth contend that Getz's testimony was admissible lay testimony, defense counsel opened the door for Getz's testimony, and the admission of Getz's testimony was at most harmless error. After careful review, we conclude that Appellant is entitled to relief.

An appellate court generally reviews a trial court's decisions regarding the admissibility of evidence for an abuse of discretion. *Jones*, 240 A.3d at 889. "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such a lack of support so as to be clearly erroneous." *Id.*

- 8 -

Pennsylvania Rule of Evidence 702, entitled "Testimony By Expert Witnesses," provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Expert testimony "is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman." *Commonwealth v. Duffey*, 548 A.2d 1178, 1186 (Pa. 1988). The standard for qualifying as an expert is a liberal one and the witness need only have "any reasonable pretension to specialized knowledge on the subject matter under investigation," and the weight to be given to the expert's testimony is for the factfinder. *Commonwealth v. Gonzalez*, 546 A.2d 26, 31 (Pa. 1988). "Expertise, whether acquired as a result of formal education or by experience, is expertise." *Commonwealth v. Auker*, 681 A.2d 1305, 1317 (Pa. 1996).

In addition to Rule 702, the legislature has enacted a statute, 42 Pa.C.S.A. § 5920, which governs expert testimony in criminal cases where the defendant is charged with sexual offenses. Section 5920 provides:

(b) Qualifications and use of experts.

(1) In a criminal proceeding subject to this section, a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence, that will assist the trier of fact in understanding the dynamics of sexual violence, victim responses to sexual violence and the impact of sexual violence on victims during and after being assaulted.

(2) If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors.

(3) The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.

(4) A witness qualified by the court as an expert under this section may be called by the attorney for the Commonwealth or the defendant to provide the expert testimony.

*Id.*

Our Supreme Court has observed that Section 5920

explicitly provides that a properly qualified expert may testify to facts and opinions regarding specific types of victim responses and behaviors in certain criminal proceedings involving sexual assaults, provided experts do not offer opinions regarding the credibility of any witness, including the victim.

*Jones*, 240 A.3d at 897. Moreover, Section 5920 prohibits lay opinion testimony concerning victim behaviors and responses to sexual abuse. *Id.* at 896 ("We disagree with the Commonwealth's assertion that Section 5920 does

- 10 -

not preclude lay opinion testimony on [victim behavior in response to sexual abuse], but merely created an avenue for expert testimony when appropriate. To conclude that some lay testimony on this subject matter is permissible would undermine our conclusion that the behavior of child sexual assault victims is beyond that generally understood by the average layperson").

In **Jones**, the defendant was convicted of sexual assault crimes against his stepdaughter ("Stepdaughter") following her allegations of sexual abuse over a period of several years. Throughout trial, defense counsel attempted to undermine Stepdaughter's credibility by focusing on discrepancies in her recounting of the timing and location of certain assaults. Detective Holzwarth, who investigated the case and interviewed Stepdaughter, testified for the Commonwealth. The detective stated that he had investigated hundreds of child sexual assault cases during his ten years as a detective. The following exchange occurred concerning Stepdaughter:

> [The Commonwealth]: Did [Stepdaughter] indicate whether or not this had been going on multiple times?
>
> [Detective Holzwarth]: Yes.
>
> [The Commonwealth]: And in your training and experience, Detective, do kids often have trouble remembering each and every time when this is an ongoing incident?
>
> [Detective Holzwarth]: Yes, they do. As a matter of fact, in our criminal complaints we normally put a little blurb in there that explains that victims–
>
> [Defense Counsel]: Your Honor, I would object to this as expert testimony. This is an opinion.

The Court: I'm going to overrule.

[The Commonwealth]: Please continue, Detective.

[Detective Holzwarth]: That explains that victims sometimes have trouble remembering exact dates when events have happened.

[The Commonwealth]: And have you also found in your training and experience with your specific cases whether or not victims will have trouble recalling in each incident that they're assaulted every single detail of the assault?

[Detective Holzwarth]: Yes.

[The Commonwealth]: And do they often times get the times that those things happened confused with other times that they discuss with you?

[Detective Holzwarth]: Yes. Very often.

***Id.***, 240 A.3d at 885. On cross examination, defense counsel asked Detective Holzwarth if it was possible that a victim's delay in reporting or inability to provide details about sexual assault incidents could mean that no abuse occurred in the first instance, to which the detective agreed. ***Id.***

Our Supreme Court held that the detective's testimony on the inability of child victims to recall specific dates or details was "opinion testimony" that "was based upon scientific, technical, or other specialized knowledge within the scope of Rule 702," specifically, "[the detective's] training and experience investigating sexual assaults." ***Id.*** at 890. The Court elaborated:

Detective Holzwarth primarily functioned as a fact witness but was also called upon to offer general opinion testimony concerning whether or not it was common for child victims of sexual assault to have trouble remembering dates and details of ongoing sexual assaults. Detective Holzwarth was asked to provide insights gained through specialized occupational training and experience

- 12 -

not within the average layperson's knowledge base as required by the plain language of Rule 702(a). Detective Holzwarth called upon the wealth of his knowledge and training as a detective with extensive experience investigating sexual assaults and made connections for the jury based on that specialized knowledge. While some laypersons may be aware of common behaviors and responses to sexual abuse, it would be a generalization to assume that the average juror is privy to the complex psychological dynamics surrounding sexual abuse. Accordingly, we hold that testimony from a law enforcement officer concerning child victims' typical behaviors and responses to sexual abuse, when based on that officer's training and experience, falls within the realm of expert testimony.

*Id.* at 891. In addition, the Court held that (1) "Section 5920 specifically provides that [Detective Holzwarth's] testimony is an appropriate topic for expert analysis," and (2) "whether expert testimony on this topic is admissible is subject to all other admissibility concerns, such as proper qualification as an expert." *Id.* at 891.

The Court also observed:

The Commonwealth's framing of its questions in terms of training and experience significantly impacts our decision in this case. By doing so, the Commonwealth signaled the imprimatur of the detective to provide generalized expert testimony regarding behavior patterns of child victims of sexual abuse. We note, however, that testimony from the detective based solely on factual observations, without extrapolation to victim behavior generally, would arguably be admissible as lay opinion testimony, as it does not signal any type of specialized knowledge.

*Id.* at 891 n.4.

The admission of the detective's testimony, the Court concluded, was not harmless error and required a new trial:

This case involved competing narratives about whether or not various sexual assaults occurred, making credibility a central

- 13 -

issue. Whether intentional or unintentional, the Commonwealth's emphasis on Detective Holzwarth's training and experience prior to eliciting testimony concerning common victim behavior in response to sexual abuse likely signaled to the jury that he was qualified to offer such a response. As a result, the jury was able to draw an inference that [Stepdaughter's] behavior in this case was consistent with similarly situated victims, without any of the heightened reliability concerns that accompany expert testimony. We therefore cannot say with certainty that the jury did not place undue weight on the testimony, despite defense counsel's attempt to neutralize the effect of the testimony on cross-examination by eliciting a concession from the detective that an inability to recall dates and times of assaults could mean no assault occurred.

*Id.* at 892.

Pursuant to ***Jones***, we review Getz's testimony under both Rule 702 and Section 5920. Getz initially gave fact-based testimony relating to her training and responsibilities at PCA and the procedures used during forensic interviews of minor victims of sexual abuse. On redirect examination, however, Getz testified, based on her nine years of experience, that it is common for child victims to under-disclose, either by denying that abuse occurred or by disclosing a "little bit" at a time. N.T., 9/27/19, at 22. Getz's redirect testimony was an expert opinion under Rule 702, because (1) it pertained to child victims' disclosure of sexual abuse, a subject outside of the average layperson's ken, (2) its purpose was to assist the trier of fact in understanding this subject, and (3) it was grounded on specialized knowledge gained through her occupational training and experience. Pa.R.E. 702(a), (b). Getz's testimony also was expert opinion under Section 5920, because it was "specialized knowledge beyond that possessed by the average layperson . . .

related to sexual violence[] that will assist the trier of fact in understanding . . . victim responses to sexual violence." 42 Pa.C.S.A. § 5920(a). The trial court abused its discretion by overruling Appellant's objection to Getz's expert testimony on redirect and by failing to qualify Getz as an expert before permitting this testimony.

The trial court and the Commonwealth both submit that Getz did not give expert testimony but present different rationales in support of their positions. We begin by analyzing the Commonwealth's reasoning.

The Commonwealth insists that the present case shares only two "superficial" similarities with ***Jones***: the witness in question was a layperson and the victim of sex crimes was a minor. Commonwealth's Petition For Post-Submission Communication, at ¶ 6. Otherwise, the Commonwealth claims, the present case is different from ***Jones***, because

> [the] witness-investigator [in ***Jones***] who had not been qualified as an expert testified to the 'complex psychological dynamics' of respondents, to wit: the 'specialized knowledge' of a child victim's capacity for 'recall' and susceptibility to mental 'confusion' by affirming that 'kids often have trouble remembering each and every time when this is an ongoing incident' and explicitly testifying that 'victims sometimes have trouble remembering exact dates . . . very often.'

***Id.*** at ¶ 7 (citing ***Jones***, 240 A.3d at 885, 891). The present case, the Commonwealth contends, "does not share this error," because Getz testified only that child victims provide information to investigators "in three amounts, large, medium and small, which [Getz] characterized as 'active disclosure,' 'reticent disclosure' and 'deny[ing] that certain things happened.'" ***Id.*** at ¶ 8

(citing N.T. 9/27/19, at 22). The Commonwealth argues this testimony was not an "opinion" founded on "scientific, technical or other specialized knowledge" but merely was Getz's "perceptions based on her experience in multiple interviews." Commonwealth's Brief at 13, 14.

The Commonwealth's argument fails because this case in fact resembles **Jones** in several important respects. In **Jones**, without first qualifying the detective as an expert, the Commonwealth elicited his expert testimony that child victims often have trouble remembering details of sexual assaults. Similarly, without first qualifying Getz as an expert, the Commonwealth obtained expert testimony from her concerning the behavior patterns of child victims in disclosing sexual abuse. The Commonwealth's labeling of Getz's testimony as "perceptions" instead of opinion testimony is unconvincing. If Getz's testimony was mere "perception," then the detective's testimony in **Jones** that child victims frequently have memory lapses was mere "perception" as well—but the Court's opinion makes abundantly clear that the detective's testimony constituted more than "perception." Furthermore, in **Jones**, the Commonwealth framed its questions in terms of the detective's knowledge and experience, a detail the Court found "significant" because it "signaled the imprimatur of the detective to provide generalized expert testimony regarding behavior patterns of child victims of sexual abuse." **Id.** at 891 n.4. Similarly, in the present case, the Commonwealth asked Getz to testify about under-disclosure based on her "nine years of experience" at PCA,

- 16 -

N.T. 9/27/19, thus signaling the imprimatur of Getz to give expert testimony on sexual abuse of children.

Unlike the Commonwealth, the trial court did not have the opportunity to address **Jones**, because it entered its opinion one month before **Jones'** issuance. The trial court asserted that Getz did not give expert testimony on the basis of a decision from this Court, **Commonwealth v. T.B.**, 232 A.3d 915 (Pa. Super. 2020). Trial Ct. Op. at 18. **T.B.**, however, is distinguishable from both **Jones** and the present case. The defendant in **T.B.** was charged with sexual crimes against a minor victim. A forensic interview specialist for PCA (the same entity that employs Getz) conducted a videotaped forensic interview with the victim and prepared a report concerning the interview. The interviewer checked off a box that the victim "provided sensory details" of the incident. **Id.**, 232 A.3d at 918. The videotape was played for the jury, and then the interviewer testified about her report. Without being formally qualified as an expert, the interviewer testified, in response to questioning by the trial court, that she had performed over 1,000 forensic interviews. The interviewer then testified that it is significant that the victim "provided sensory detail" because "a child's ability to describe a situation, including details of how something sounded or something tasted or something felt, speaks to an experience having occurred." **Id.** This Court held that the interviewer did not give expert testimony:

> The Commonwealth was seeking factual evidence of how the study, or interview here, was composed. [The interviewer] was

> asked to explain what sensory detail is and why that is important to an interview. She appropriately explained that sensory detail speaks to an experience having occurred. She did not offer any opinion testimony[.]

*Id.* at 920. The testimony in *T.B.* merely concerned a factual subject—how the PCA worker gathered evidence for her report—instead of a subject requiring expert testimony. The testimony in *Jones* and this case, on the other hand, concerned the behavior of victims in response to sexual abuse, a subject that requires expert testimony under Pa.R.E. 702 and Section 5920.

Having concluded that Getz presented expert testimony, we turn to an alternative argument posited by both the trial court and the Commonwealth: defense counsel "opened the door" for expert testimony on redirect by obtaining Getz's admission on cross-examination that the victim failed to disclose several sexual assaults to investigators in multiple pretrial interviews. We disagree for several reasons. In *Jones*, defense counsel's strategy "involved discrediting the victim," *id.*, 240 A.3d at 886, yet the Court held that this did not justify expert testimony by the detective without him first being qualified as an expert. Similarly, defense counsel's strategy in the present case was to discredit the victim by contrasting the victim's in-court testimony with her statement to the PCA interviewer. Under *Jones*, this did not justify Getz's expert testimony on redirect without the court qualifying her as an expert. Furthermore, the Commonwealth fails to provide any authority, nor can we find any, for the proposition that impeachment of a fact witness such as Getz permits her to give expert testimony on redirect without being

qualified as an expert. The cases cited by the Commonwealth merely teach that in certain situations, impeachment of a fact witness opens the door for otherwise inadmissible factual testimony. *See Commonwealth v. Lewis*, 885 A.2d 51, 54-55 (Pa. Super. 2005) (defense counsel opened door to testimony about defendant's prior bad acts by questioning police witness about drug-related encounters with defendant); *Commonwealth v. Bey*, 439 A.2d 1175, 1178 (Pa. Super. 1982) (counsel opened door to evidence of defendant's post-arrest silence by questioning detective about what defendant told him); *Commonwealth v. Stakley*, 365 A.2d 1298, 1299-1300 (Pa. Super. 1976) (defense counsel's suggestion that defendant had been honorably discharged from military opened door to rebuttal testimony that he had not); *see also United States v. Daniels*, 617 F.2d 146, 150-51 (5th Cir. 1980) (under doctrine of fair response, government could argue during closing that defendant had not been cooperative with the IRS after defense counsel argued that defendant had cooperated).

Had Appellant's counsel asked Getz for her opinion why a victim would give testimony during trial about events she failed to disclose prior to trial, the door might have opened for Getz's expert testimony on redirect. Defense counsel however, did not request Getz's opinion; counsel merely pointed out factual inconsistencies in the victim's testimony. This did not entitle Getz to present expert testimony on redirect absent her being qualified as an expert.

Finally, the trial court stated that any prejudice caused by Getz's redirect testimony was "remedied on recross examination," because Getz "conceded that an alternative reason the allegations by child victims change was that they are untruthful."[2] Trial Ct. Op. at 18. Our review of the record reveals Getz did not make any such concession. Although she admitted that children change their accounts over time, whether they are telling the truth is "not something the forensic interviewer decides." N.T. 9/27/19 at 23.

Furthermore, the admission of Getz's redirect testimony was not harmless error. The harmless error doctrine requires us to vacate the order on review to correct the error unless we are "convinced beyond a reasonable doubt that the error is harmless." *Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978). We may consider error harmless only where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Taylor*, 209 A.3d 444, 450 (Pa. Super. 2019). "Harmless error exists where the appellate court is convinced beyond a reasonable doubt that the erroneously admitted evidence could not have contributed to the

---

[2] The Commonwealth does not raise the harmless error doctrine.

- 20 -

verdict. If there is a reasonable probability that an error may have contributed to the verdict, the error is not harmless." ***Id.***

Here, the evidence against Appellant was not overwhelming, and the jury deliberated several days before reaching its verdict. As in ***Jones***, the present case "involved competing narratives about whether or not various sexual assaults occurred, making credibility a central issue." ***Id.***, 240 A.3d at 892. The victim gave multiple incomplete versions of events and testified that she would lie under oath if told to do so. There was no physical evidence or forensic evidence to support her claims. Appellant denied any wrongdoing, and other fact witnesses testified that they did not observe any inappropriate conduct. In this context, Getz's testimony about under-disclosure could have had a material impact on the verdict. The Commonwealth's emphasis on Getz's experience on direct and redirect examination likely signaled to the jury that she was an expert on this subject and influenced the jury to place undue weight on her testimony. It also is possible that the prosecutor influenced the jury by referring to Getz's testimony during closing argument to explain away the inconsistencies in the victim's testimony. N.T. 9/30/19, at 102 ("with disclosures, with talking about something that happened to you, it doesn't always also come out all at once. You heard about the process of under-disclosing and how that is not unusual"). Further prejudice may have occurred due to the Commonwealth's failure to designate Getz as an expert in advance of trial, thus depriving Appellant of any opportunity to prepare expert

testimony of his own or search for any studies or research that refuted Getz's opinions or conclusions.

For the above reasons, we conclude that the improper admission of Getz's redirect testimony entitles Appellant to a new trial.

In his second argument, Appellant objects to the trial court's refusal to issue a "prompt complaint" instruction to the jury, an objection he preserved for appeal by raising it at a charging conference and again following the jury charge. Appellant points out that the victim failed to report his conduct during late 2016 and 2017, when she lived in Appellant's apartment, and did not report it until May 2017, one month after moving out of the apartment. Since we are remanding this case for a new trial, we will address this issue, as it likely may arise again on retrial. Upon review, we conclude that the trial court did not abuse its discretion by refusing to give a prompt complaint instruction.

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Snyder*, 251 A.3d 782, 790 (Pa. Super. 2021). "A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions." *Id.*

Our legislature has prescribed with regard to prompt complaints from victims of crime:

> Prompt reporting to public authority is not required in a prosecution under this chapter: Provided, however, [t]hat nothing in this section shall be construed to prohibit a defendant from introducing evidence of the complainant's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3105. If a crime victim promptly reports the crime, the law presumes that she has not had time to fabricate the story, lending her account more credibility. *Commonwealth v. Jones*, 672 A.2d 1353, 1356 (Pa. 1990). Conversely, where a victim delays reporting the crime "substantially" and "without any reasonable explanation," the factfinder may draw inferences regarding the credibility of the complaint "and against whether the incident has occurred." *Id.*

Consistent with these principles, a prompt complaint instruction rests upon "a belief that a victim of a violent assault would reveal the assault occurred at the first available opportunity." *Snyder*, 251 A.3d at 791. The instruction permits a jury to call into question a complainant's credibility when she did not complain at the first available opportunity. *Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013). The propriety of a prompt complaint instruction

> is determined on a case-by-case basis pursuant to a subjective standard based upon the age and condition of the victim. For example, where the victim of a sexual assault is a minor who may not have appreciated the offensive nature of the conduct, the lack of a prompt complaint would not necessarily justify an inference

of fabrication. This is especially true where the perpetrator is one with authority or custodial control over the victim.

**Snyder**, 251 A.3d at 791.

The trial court and the Commonwealth take the position that a prompt complaint was not proper under **Commonwealth v. Snoke**, 580 A.2d 295 (Pa. 1990), and **Snyder**. In **Snoke**, the defendant committed a sexual assault against his five-year-old daughter and told her afterward that it would be "their little secret." **Id.**, 580 A.2d at 299. The child revealed the incident five months later after viewing a film at her elementary school concerning sexual assault that explained the difference between "good touching" and "bad touching." **Id.** Our Supreme Court observed:

> Where no physical force is used to accomplish the reprehensible assault, a child victim would have no reason to promptly complain of the wrong-doing, particularly where the person involved is in a position of confidence. Where such an encounter is of a nature that a minor victim may not appreciate the offensive nature of the conduct, the lack of a complaint would not necessarily justify an inference of a fabrication. . . . [T]he child had no reason to question the character of the conduct until her subsequent viewing of a film depicting this type of conduct. It is also significant that the party involved in the behavior was her father whom she would naturally trust and accept his judgment as to the propriety of the act. The encouragement by the father to maintain the confidence as to this incident also dilutes any inference drawn merely from a delayed complaint. In this setting the absence of an immediate outcry would not in and of itself warrant an inference that the event was a recent fabrication and, therefore, a charge to that effect was properly denied by the trial court.

**Id.** The Court further noted that the trial judge "instruct[ed] the jury thoroughly upon the general subject of credibility in accordance with the

- 24 -

suggested instruction for witness credibility, PA Suggested Standard Jury Instructions (Crim.) § 4.17." *Id.*

In *Snyder*, the defendant lived in the same house as the twelve-year-old victim and her family. He also was a close friend of the family who often supervised the victim and her brother. The defendant visited the victim's bedroom one night and awoke her by rubbing her inner leg and vaginal area. The victim asked, "What are you doing?" and the defendant left the room. The victim testified that she was scared and confused, and she delayed disclosing the assault for four months. This Court held that the trial court properly denied a prompt complaint instruction due to the victim's disposition, the nature of the defendant's relationship with the victim's family, and the non-violent nature of the assault. *Id.*, 251 A.3d at 791.

The present case shares some similarities with, but is not identical to, *Snoke* and *Snyder*. Similar to the victims in *Snoke* and *Snyder*, the victim herein was only ten years old at the time of the alleged assaults. In addition, Appellant had a close relationship with the victim's family and a supervisory role over the victim and her brother. The victim was afraid to report the alleged assaults, because Appellant had hit her brother, so she was afraid Appellant might hit her. The victim also was afraid about how her pregnant mother might react to news of the alleged assaults. Appellant's alleged sexual encounters with the victim do not appear to have been violent. These details counsel against a prompt complaint instruction. On the other hand, two

features in this case that were not present in **Snoke** or **Snyder** arguably support a prompt complaint instruction: the victim's inconsistent accounts of the events and her admission that she would lie under oath if told to do so. From this, it might be contended that a prompt complaint instruction was proper because the victim displayed dishonest tendencies, and her delay in disclosure was further evidence of her dishonesty.

Nevertheless, we conclude that the trial court properly overruled Appellant's request for a prompt complaint instruction. The court had wide discretion in fashioning its instructions, **Snyder**, 251 A.3d at 790, and in a case such as this, where some evidence favored a prompt complaint instruction and some did not, it fell within the court's discretion to deny this instruction. Furthermore, as in **Snoke**, the trial court thoroughly instructed the jury on the general subject of credibility and on how to evaluate inconsistent statements made by the victim. N.T. 10/1/19, at 14-20. These instructions were "sufficient to permit the jury to ascertain the truthfulness of the testimony offered by the minor complaining witness as well as of others who testified in this matter." **Snoke**, 580 A.2d at 299-300.

In summary, we vacate and remand for a new trial because the trial court abused its discretion by permitting Getz to provide expert testimony on redirect on "under-disclosure" by child victims without first qualifying Getz as an expert. We discern no abuse of discretion in the trial court's denial of Appellant's request for a prompt complaint charge.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/28/2022