J-A13029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PABLO COTTO-MARTINEZ | : | |
| | : | |
| Appellant | : | No. 928 MDA 2022 |

Appeal from the Judgment of Sentence Entered June 1, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004136-2020

BEFORE: BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.: **FILED: JULY 26, 2023**

Pablo Cotto-Martinez appeals from the judgment of sentence, entered in the Court of Common Pleas of Lancaster County, after a jury convicted him of rape (child less than 13 years old),[1] statutory sexual assault,[2] sexual assault,[3] unlawful contact with a minor,[4] corruption of a minor,[5] and incest.[6] After review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 3121(c).

[2] *Id.* at § 3122.1.

[3] *Id.* at § 3124.1.

[4] *Id.* at § 6318.

[5] *Id.* at § 6301.

[6] *Id.* at § 4301.

This case stems from J.C.'s allegation of rape by her paternal uncle, Cotto-Martinez, who had lived with J.C., Father, Mother, her older sister, S.C. (Sister), and younger sister, K.C., at their South Prince Street residence in Lancaster, Lancaster County. Cotto-Martinez, his wife, and their three children, had come from Puerto Rico to Lancaster County in the summer of 2007 and resided there until at least mid-December 2007.[7] During this six-month timeframe, J.C. was five and six years of age.

Cotto-Martinez and his family stayed in the "cold room," which was on the second floor of the residence. N.T. Jury Trial, 2/16/22, at 63 (J.C. explaining cold room had no heat and had crack in door that let air in); *id.* at 68 (J.C. testifying cold room had one bed on floor). J.C.'s bedroom, which she shared with her sisters, was also on the second floor. *Id.* at 101.

J.C. testified that one day, at around noon, while she was bringing dishes from the second floor to the kitchen,

> "I heard [Cotto-Martinez] say my name. I set the dishes down by the stairwell, and then I went into the room, the cold room, and he asked me to give him a hug. He turned me around and pushed me down onto the bed. And then he pulled down my dress, or my skirt, whatever I was wearing. I don't remember. And then proceeded to pull out his penis and penetrate [me].

---

[7] Although it is unclear the exact dates Cotto-Martinez lived at the South Prince Street address, he and his family moved in during the summer months in 2007 and his children transitioned to school with J.C. and her siblings. *See* N.T. Jury Trial, 2/16/22, at 102. Cotto-Martinez also provided the South Prince Stret address to Detective James Boas of the Lancaster City Bureau of Police on December 18, 2007, as his place of residence. *Id.* at 114.

*Id.* at 71. J.C. explained that Cotto-Martinez penetrated "[her] vagina," that she did not understand what was going on, and that she felt "uncomfortable." *Id.* at 72. During the incident, Cotto-Martinez "told [J.C.] to give him a hug and then nothing after that." *Id.* (J.C. testifying she saw Cotto-Martinez's face when she gave him hug). It stopped when "[Cotto-Martinez] pulled up my skirt and underwear and then told me to get up. I went away and [] just left, and then I went to the bathroom." *Id.* In the bathroom, "[J.C.] went to pee and to check what had happened. And when [she] went to wipe, [she] saw blood on [the] toilet paper." *Id.* J.C. testified that this happened once. *Id.* at 73.

This abuse by Cotto-Martinez was originally discovered by Detective Heather Halstead of the Lancaster County Bureau of Police during an investigation of Sister's alleged sexual abuse by Father. Detective Halstead testified that she initially interviewed Sister regarding her allegations of sexual abuse by Father and then interviewed J.C. because it is common practice to interview other children in the home. *Id.*, 2/17/22, at 135. J.C. told Detective Halstead that Father had sexually abused her over 500 times in the cold room. *Id.*, 2/16/22, at 78. Father started "touching" J.C. when she was 8 or 9 years old, and he first had sexual intercourse with J.C. when she was 11 or 12 years old. *Id.* at 75; *id.* at 76 (J.C. testifying intercourse would happen "pretty often"). J.C. did not tell anyone about this "because [Father] was threatening [her]." *Id.* at 80.

When Detective Halstead asked J.C. if anyone other than Father had hurt her body, J.C. replied that Cotto-Martinez had done things to her when she was 7 years old. *Id.* at 137. At trial, J.C. testified she is "one hundred percent" sure that Cotto-Martinez was the perpetrator of this specific incident that afternoon. *Id.* at 79 (J.C. testifying, "Because at that age[,] I remember it happening"). She also testified that Father and Cotto-Martinez do not look alike, differ in height, and have different head shapes. *Id.*

J.C. testified that when she was "still young," and after Cotto-Martinez had moved out of the house, she told her parents "that something uncomfortable had happened with [Cotto-Martinez] because [she] didn't really understand what had happened[. She] explained what had happened, and [her parents] didn't really pay much attention." *Id.* at 74. Mother testified, "[J.C.] said that [her] uncle had grabbed her, he had wrapped her like that. . . she was telling me that she had a little bit of blood in her underwear[, and] she was, like, five years old, something like that. . . . I did not pay too much attention to it because she was little." *Id.* at 92; *id.* at 95-96 (Mother explaining she does not remember J.C.'s exact age, but that J.C. was younger than 8). Mother also testified that Cotto-Martinez and his family were kicked out of the Prince Street address following a fight between Father and Cotto-Martinez. *Id.* at 93 (Mother did not testify as to which month or year this occurred).

Sister, who is two-years older than J.C., testified that J.C. came to tell her about the incident when Sister was in her "early teens." *Id.* at 105 (Sister

explaining she did not know her exact age "but it was before I was 16"). Sister stated, "J.C. had told me that [Cotto-Martinez] had inserted himself and that there was blood[,] and it was in the cold room." *Id.* at 104. Sister also explained that Cotto-Martinez and his family left following an argument between Father and Cotto-Martinez. *Id.* at 103 (Sister did not testify as to which month or year this occurred).

Detective Halstead also testified that in her experience, including interviewing "close to a hundred" children or teenagers in connection with sexual abuse allegations, it is not common for children to be able to give an exact time frame of alleged conduct and that is why she does research to determine when the abuse probably happened. *Id.* at 141.

At trial, the following exchange occurred:

[Prosecuting Attorney]: And in your experience, is it common for children to be able to give you an exact time frame of when these things happened?

[Investigator Halstead]: No.

[Prosecuting Attorney]: Is it fair to say that is why you try to do research, to figure out when it probably happened?

[Investigator Halstead]: Yes.

*Id.* at 141. Detective Halstead testified, that because "[Cotto-Martinez] would have been [in Pennsylvania] in 2007, and [J.C.] would have turned 6 in November of – so she was born in [20]02[,] she would have been five [in November]." *Id.* at 145.

In September of 2020, Detective George Bonilla of the Lancaster County District Attorney's Office and Detective Halstead extradited Cotto-Martinez from Puerto Rico to Lancaster. During transport, Cotto-Martinez complained that the officers were "kidnapping" him and stated that only lived in Connecticut, never Lancaster County, Pennsylvania. *Id.* at 112.

Doctor Morgan Griska was qualified by the court as an expert in sexual assault exams and their findings. *Id.* at 130. Doctor Griska, who did not see J.C. as a patient, testified that she would have expected J.C. to have a normal exam due to the healing capabilities of female genitalia and the delay in revelation, which is common for child sex-abuse victims. *See id.* at 133 (Doctor Griska testifying female genitalia—made of mucosal tissue, like in cheeks—heals within days); *id.* at 131 (Doctor Griska testifying due to close/trusted relationship child has with abuser, revelation is commonly delayed).

On October 13, 2021, prior to trial, the trial court conducted a "Tender Years" hearing, at which Mother and Sister testified regarding statements J.C. had made to them regarding the abuse. At the hearing, Mother testified that J.C., 10 or 11 years old at the time, told Mother, "she had looked at her underwear and she found blood and that the one who had squeezed her like that, who had hugged her like that, was [Cotto-Martinez]." N.T. Tender Years Hearing, 10/13/21, at 15-16; *id.* at 17 (Mother testifying this conversation occurred four or five years after Cotto-Martinez had moved out). At that time, Mother "thought it was a lie." *Id.* at 16.

Sister, 20-years-old at the time of the hearing, testified that J.C. told her about the abuse when Sister was 14 years old, and J.C. was 12 years old. *Id.* at 7. Sister testified that J.C. came to her and "[J.C.] said that [Cotto-Martinez] touched her and that [] it was in the [] cold room; that it was when [Cotto-Martinez] lived with us, and she came out crying and there was blood. . . [J.C.] did say that she saw him. . . his private parts and – yeah, I'm not sure if anything was inserted." *Id.* at 8 (Sister testifying she remembers J.C. telling Sister Cotto-Martinez touched her); *id.* at 10 (J.C. testifying that she "assum[ed the blood] was from penetration"). J.C. also told Sister that "[J.C.] saw [Cotto-Martinez's] thing and he saw hers, and the reason [J.C.] left the room was because of the bleeding." *Id.* at 11. Sister told J.C., "to tell somebody, because I was going through my own stuff, too. So[,] I thought that, you know, if she told then I could just tell mine after." *Id.* (Sister explaining her "own stuff" was her own sexual abuse by Father).

Following two days of trial, a jury, on February 17, 2021, found Cotto-Martinez guilty of the above-mentioned offenses. The trial court deferred sentencing to allow for the preparation of a presentence investigation report. Additionally, the Sex Offender Assessment Board (SOAB) was ordered to provide the District Attorney's Office with an SOAB assessment. *Id.* at 209. On June 1, 2022, the court sentenced Cotto-Martinez to an aggregate term of 20 to 40 years' incarceration. Cotto-Martinez did not file post-sentence motions, but filed a timely appeal to this Court. Cotto-Martinez raises the following issues for our review:

- 7 -

1. Did the trial court err when it ruled after the [T]ender [Y]ears hearing that the hearsay statements of the victim were admissible when those hearsay statements were made approximately 6 years after the alleged incident, thereby rendering the hearsay statements unreliable and not admissible?

2. Did the trial court err when, over [Cotto-Martinez's] objection, it permitted Detective [] Halstead, who was not qualified as an expert, to testify a[s] an expert about her experience with children in sexual assault cases not being clear with their recollection of dates and timeframes?

Appellant's Brief, at 4.

Cotto-Martinez first argues that J.C.'s statements made to Sister and Mother are inadmissible hearsay under the Tender Years statute because they lack sufficient indicia of reliability. Appellant's Brief, at 13-14. He claims that the reliability of the statements was, "eroded by the length of time between the alleged incident" and the statements, and, during this time, J.C. had been experiencing ongoing sexual abuse by Father. *Id.* at 13, 16. Cotto-Martinez claims he was prejudiced by admission of this evidence because it was used to bolster J.C.'s credibility. *Id.* at 17.[8]

In ***Commonwealth v. Curley***, 910 A.2d 692 (Pa. Super. 2006), this Court explained the Tender Years statute hearsay exception.

> The [T]ender [Y]ears statute creates an exception to the hearsay rule in recognition of "the fragile nature of young victims of sexual

---

[8] Cotto-Martinez's defense theory was that J.C.'s memory was tainted due to her young age, the short window of time Cotto-Martinez resided with the family, and the ongoing sexual abuse by Father. ***See*** N.T. Jury Trial, 2/17/22, at 156 (Defense counsel, at closing argument, stating, "[T]he sins of [Father], [do not] go to [Cotto-Martinez]. That is something completely different. But I think it is important to the case because it explains, you know, where this afterthought came of my Uncle Pablo[, Cotto-Martinez,] did this to me.").

abuse." [It] allows statements made by a child[-]victim of sexual assault to be admitted into evidence, if the statements are relevant and sufficiently reliable. [This Court] will not reverse the trial court's decision to admit evidence pursuant to the [T]ender [Y]ears statute absent an abuse of discretion.

*Id.* at 697 (citations and quotation marks omitted). In order to admit a child-victim's statement, the Commonwealth must: (1) notify the adverse party of the particulars of the child's statement; and (2) demonstrate that the child's statements are relevant and that the time, content, and circumstances of the statement provide sufficient indicia of reliability. *See id.* at 698; *see also* 42 Pa.C.S.A. § 5985.1. Following the Commonwealth's compliance, the child-victim's out-of-court statements offered to prove the truth of the matter asserted are admissible. *Curley*, *supra* at 299.

In *Commonwealth v. Delbridge*, 885 A.2d 27 (Pa. 2003), the Supreme Court of Pennsylvania provided a non-exclusive list of factors to be considered when a trial court determines the reliability of a child victim's hearsay statement under section 5985.1. Those factors include: the spontaneity of the statements; the declarant's consistency in repetition; the declarant's mental state; the use of terms unexpected in children of that age; and the lack of a motive to fabricate. *Id.* at 47, citing *Idaho v. Wright*, 497 U.S. 805, 821-22 (1990).

Cotto-Martinez's claim challenges the second prong of the test to admit tender year statements—the reliability of J.C.'s statements. He argues that J.C. statements to Mother and Sister, made five to seven years after the alleged incident, during which J.C. was also suffering abuse by her Father,

were "a cry for help to stop the routine sexual abuse she was experiencing at the hands of [F]ather." Appellant's Brief, at 17. This argument is meritless.

J.C. testified that she was 8 or 9 years old when Father began "touching" her and 11 or 12 years old when intercourse began. Mother testified that J.C. was **younger** than 8 when J.C. told Mother about the abuse by Cotto-Martinez. *See* N.T. Jury Trial, 2/16/21, at 96. Therefore, J.C. disclosed abuse by Cotto-Martinez prior to when abuse by Father began. Moreover, J.C. did not tell **the police** about Cotto-Martinez's conduct until the investigation into allegations of sexual abuse by her Father had already begun. N.T. Jury Trial, 2/17/22, at 135. There is no reason that J.C. would again accuse Cotto-Martinez if the original accusation was truly a cry for help for abuse by Father.

Here, both J.C.'s statements to Sister and Mother were unsolicited. Sister's statements at the Tender Years Hearing indicate that J.C. approached Sister, and separately approached Mother, to disclose the incident. N.T. Tender Years Hearing, 10/13/21, at 7, 15. Additionally, J.C.'s statements to Mother, in which she used age-appropriate language, are consistent with those made to Sister. *Id.* at 11 (Sister testifying J.C. had seen Cotto-Martinez's "thing" and there was bleeding); *id.* at 15-16 (Mother testifying that J.C. told Mother there was blood in J.C.'s underwear and only person who had "squeezed" and "hugged" her was Cotto-Martinez). Moreover, there is no testimony that J.C.'s mental state was compromised at the time she made these statements.

Most importantly, even without Sister's and Mother's testimony, J.C.'s testimony is sufficient to support a rape conviction. ***See Commonwealth v. Poindexter***, 646 A.2d 1211, 1214 (Pa. Super. 1994) (rape victim's uncorroborated testimony to penile penetration sufficient to establish intercourse and, thus, support rape conviction). J.C. testified she was "one hundred percent sure" that Cotto-Martinez sexually abused her. ***Id.*** at 72. J.C. further explained that Father and Cotto-Martinez do not look alike and that she saw Cotto-Martinez's face when he asked her for a hug. ***Id.***

Based on our review of the record, we conclude that the time, content, and circumstances of J.C.'s statements provide sufficient indicia of reliability. Therefore, the trial court did not abuse its discretion in allowing Sister and Mother to testify. ***Curley***, ***supra***.

Next, Cotto-Martinez claims that the trial court erred in permitting Detective Halstead to testify regarding her **opinion** as to a child's conduct during a sex abuse investigation. ***See*** Appellant's Brief, at 17. He argues that ***Commonwealth v. Jones***, 240 A.3d 881 (Pa. 2020) prohibits such testimony from a lay witness. ***See*** Appellant's Brief, at 18.

In ***Jones***, our Supreme Court determined that the trial court erred in admitting opinion testimony of a lay witness, a detective, regarding the inability of child victims of sexual abuse to recall specific dates. There, the detective was asked whether, in his training and experience, children, who are victims of ongoing abuse, have trouble recalling each and every incident and exact dates of a specific incident. ***Jones***, ***supra*** at 885.

- 11 -

Instantly, Detective Halstead testified that based on her professional experience, it is uncommon for children to be able to give an exact time frame of when incidents of sexual abuse occurred. **See** N.T. Jury Trial, 2/17/21, at 141. As in **Jones**, the testimony offered by Detective Halstead regarding child sex abuse victims is of the type reserved for an expert witness. **See** Pa.R.E. 702 (governing expert testimony generally); **see also** 42 Pa.C.S.A. § 5920 (governing expert testimony in criminal cases where defendant charged with sexual offenses). Specifically, Detective Halstead's opinion testimony was of the type reserved for an expert, as: (1) it pertained to a child victims' disclosure of sexual abuse, a subject outside the ken of the average layperson; (2) its purpose was to assist the trier of fact in understanding the subject; and (3) it was grounded in specialized knowledge gained through occupational training and experience. **See** Pa.R.E. 702(a)-(b). **See also** 42 Pa.C.S.A. § 5920 ("If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors"); **see also Jones**, **supra**, at 885 (explaining "[I]t would be a generalization to assume that the average juror is privy to the complex psychological dynamics surrounding sexual abuse").[9] Accordingly, we turn to the question of whether Cotto-Martinez is afforded a new trial.

_____

[9] The trial court and the Commonwealth also concede that pursuant to **Jones**, **supra**, Detective Halstead's testimony was improperly admitted. **See** Trial Court Opinion, 8/17/22, at 15 ("Pursuant to the holding in **Jones**, Detective Halstead's testimony was undoubtedly improper."); Commonwealth Brief, at
*(Footnote Continued Next Page)*

In fashioning a remedy, the **Jones** Court considered whether the admission was harmless error. An error may be considered harmless "only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. . . . An error cannot be held harmless unless the appellate court determined that the error could not have contributed to the verdict. Whenever there is a reasonable probability that an error might have contributed to the conviction, the error is not harmless." **Jones**, **supra** at 891, citing **Commonwealth v. Story**, 383 A.2d 155, 162, 164 (Pa. 1978).

Harmless error exists if the Commonwealth proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. **Id.** at 892, citing **Commonwealth v. Fulton**, 179 A.3d 475, 493 (Pa. 2018).

The **Jones** Court ultimately determined that, because the case involved competing narratives about whether or not various sexual assaults occurred, credibility of witnesses was a central issue, and, thus, the admission of the

---

16 ("In light of the legislature's enactment of [section] 5920 and the Pennsylvania Supreme Court's decision in [**Jones**], the Commonwealth concede[s] that the trial court erred in allowing the admission of Detective Halstead's testimony that it is uncommon for children to be able to give an exact timeframe of when sexual abuse has occurred.").

- 13 -

testimony was not harmless. *Jones*, *supra* at 892. There, the Commonwealth, by emphasizing the detective's training and experience prior to eliciting testimony concerning the victim's behavior, either intentionally or unintentionally, signaled to the jury that the detective was qualified to offer such testimony. As a result, the jury was able to infer, without any of the heightened reliability concerns that accompany expert testimony, that the victim's behavior in this case was consistent with similarity situated victims. *Id.*

Recently, this Court applied *Jones* in *Commonwealth v. Williams*, 274 A.3d 722 (Pa. Super. 2022). There, we considered whether testimony of a lay witness regarding a child victim's "under-disclosure"[10] of sexual abuse incidents entitled the defendant to a new trial. In considering whether the error was harmless, the Court discussed whether the trial court's error in admitting the testimony was prejudicial and whether evidence of defendant's guilt was overwhelming.

The *Williams* Court concluded that the defendant was prejudiced because the Commonwealth's emphasis on the lay witness' experience on this subject likely signaled to the jury that the witness was an expert and influenced the jury to place undue weight on her testimony. *Id.* at 735. The Court also determined that evidence against the defendant was not overwhelming. The Court highlighted the fact that the jury deliberated for

---

[10] Under-disclosure includes either denying abuse occurred or disclosing information slowly over time.

several days prior to reaching a verdict, the victim gave multiple incomplete versions of events, the victim testified that she would lie under oath if told to, and that other fact witnesses testified that they did not observe any inappropriate conduct. *Id.*

Here, the Commonwealth claims the evidence of Cotto-Martinez's guilt was overwhelming where J.C. testified consistently about the single instance of abuse and stated she is "one hundred percent" certain that Cotto-Martinez abused her. *Id.* at 72. Additionally, Cotto-Martinez attempted to distance himself from the crimes when he told Detective Halstead that he never lived in Lancaster, despite evidence to the contrary. Moreover, it only took the jury two hours and forty minutes to reach its verdict. Commonwealth's Brief, at 20-21. We agree.

Instantly, unlike in *Williams*, J.C. gave complete and consistent statements during trial and to Mother and Sister. *See* N.T. Jury Trial, 2/15/21, at 71, 74. J.C. was clear that the abuse occurred one time in the cold room and that various members of her family were downstairs when it happened. *Id.* at 71. J.C. testified that she was one hundred percent sure Cotto-Martinez sexually abused her, that she was old enough to know the difference between her Father and her uncle, and that she remembered the abuse happening. *Id.*

Additionally, as per Mother's and Sister's testimony, J.C.'s statements to them were consistent: Cotto-Martinez had touched J.C. and there was blood in her underwear. *Id.* at 92, 104. Mother also confirmed that when J.C. first told Mother about the incident, Mother did not believe J.C. because

she was so young. *Id.* at 92. Furthermore, there was no testimony that J.C. had a reason to lie or was lying regarding the incident and identity of her abuser.[11]

_____

[11] The Commonwealth makes two other harmless error arguments, that we determine are meritless. The Commonwealth first contends that the testimony is cumulative where Dr. Griska testified that "it is incredibly uncommon for children to come forward immediately after abuse has occurred." N.T. Jury Trial, 2/17/22, at 131. The Commonwealth claims that the "natural inference" from Dr. Griska's testimony is that "most child victims allow time to pass before disclosing [abuse, thus], diminishing their ability to provide exact dates of their abuse." *See* Commonwealth's Brief, at 22. However, this testimony is not cumulative. Doctor Griska's testimony focuses on the reason child sex abuse victims delay in revealing the abuse and the impact such delay has on a medical examination, not the impact the delay in revealing abuse has on a child's ability to remember dates.

The Commonwealth also argues the trial court's admission of Detective Halstead's testimony did not prejudice the defendant where the "competing narratives" at issue are related to identity, not timing. The Commonwealth claims that the time Cotto-Martinez lived at Prince Street was not at issue because in defense counsel's closing statement he conceded that Cotto-Martinez lived with J.C. and her family for approximately six months in 2007. Moreover, the theory of the case as per defense counsel's opening and closing statement was that J.C. mistakenly believed Cotto-Martinez was the perpetrator, rather than Father. Commonwealth's Brief, at 19-20.

Although defense counsel agreed that Cotto-Martinez resided at the Prince Street address with J.C. and her family for roughly six months in 2007, J.C.'s credibility was consistently attacked due to her lack of memory regarding the timing of the abuse and her age at the time of alleged abuse. N.T. Jury Trial, 2/16/21, at 81 (defense counsel asking J.C. what season abuse occurred); *id.* at 82 (same); *id.* at 84-85 (defense counsel asking J.C.'s her age when abuse occurred); *id.* at 158 (Commonwealth attorney explaining in closing argument that dates go to credibility).

Additionally, defense counsel's closing statement begins, "I know I'm making a big deal about dates here, but there is a reason for that." N.T. Jury Trial, 2/16/21, at 153. He went on to say, "[The Commonwealth is] going to tell
*(Footnote Continued Next Page)*

Accordingly, although the trial court erred in admitting Detective Halstead's testimony regarding the tendency of child sex abuse victims to lack recall of dates, this error was harmless in light of the overwhelming evidence of Cotto-Martinez's guilt. Thus, we affirm. ***Story***, ***supra***.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2023

---

you [] the dates don't matter[.] The dates matter here because there is a very small window of time that [Cotto-Martinez] resided with Father []. And it is important because a memory of a four-year-old, who is going through sexual abuse [at] the hands of her father, could be tainted." ***Id.*** at 156. Thus, if the main issue in the case is identity, timing is without a doubt a close second.