J-S21037-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRYAN PAUL BLACKBURN | : | |
| | : | |
| Appellant | : | No. 1429 MDA 2022 |

Appeal from the Judgment of Sentence Entered September 15, 2022
In the Court of Common Pleas of Wyoming County Criminal Division at
No(s): CP-66-CR-0000002-2021

BEFORE: BOWES, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED JULY 27, 2023**

Bryan Paul Blackburn (Blackburn) appeals from the judgment of sentence entered in the Court of Common Pleas of Wyoming County (trial court) after his jury conviction of one count each of terroristic threats, harassment and simple assault and sentenced to an aggregate term of not less than eighteen nor more than sixty months' incarceration.[1] He challenges the discretionary aspects of the sentence and argues that the trial court abused its discretion by using the Pennsylvania Suggested Standard Criminal Jury Instruction (SSJI) for justification: use of force for the protection of

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2708(a)(1), 2709(a)(4) and 2701(a)(3), respectively. The jury found Blackburn not guilty of simple assault, 18 Pa.C.S. § 2701(a)(1).

property instead of the SSJI for justification; defense of property (castle doctrine) as he proposed. We affirm.

## I.

On January 18, 2021, the Commonwealth filed an information charging Blackburn with the foregoing charges relating to an August 7, 2020 incident that occurred when he confronted a repossession company with a gun and fired a warning shot on property of 407 Windy Lane, Windham Township, Wyoming County (Property). The approximately five-acre Property consists of three parcels owned by Blackburn, his sister, Helen Flail (Helen) and brothers Walter Blackburn (Walter) and John Blackburn (John). There is a shared driveway and several houses/trailers and outbuildings on the Property, which does not contain fences or other demarcations between the individual parcels of land. Helen, Walter and John have residences on the Property. Blackburn is on disability due to a bad back and circulatory problems and lives in John's residence. Helen does not live at the Property but uses her residence when visiting.

On July 25, 2022, the matter went to a jury trial. In pertinent part, Stanton Rush (Rush), James Constantine (Constantine), Helen and Blackburn testified.

**A.**

**1.**

Rush, employed by a repossession company, testified that he received an order from Community Bank N.A. to pick up a trailer that was in delinquency from Walter at the Property. He said they positioned their truck in front of the trailer and exited the truck to confirm that the trailer's vehicle identification number matched what was on the repossession paperwork. According to Rush, when Helen approached the men, he and Constantine identified themselves as agents working on behalf of Community Bank N.A. Constantine had the paperwork and he and Rush spoke with Helen and asked if Walter was there because they had an order to repossess his trailer. Rush testified that they did not get a clear answer. The men entered the trailer.

Rush stated that Helen briefly left and then came back with Blackburn, who was "fired up ready to brawl," immediately screaming at Rush and Constantine to "get the f[]k out." (N.T. Trial, 7/25/22, at 94-95, 110). Blackburn did not ask any questions. Rush unsuccessfully tried to calm Blackburn down, but he continued to scream and told Rush he was going to get his gun and shoot up their truck. Blackburn did not identify himself.

Rush asked Constantine to contact the Pennsylvania State Police (PSP) because it was getting uncomfortable and they were trying to discuss with Helen how to get in touch with Walter so they "could leave the scene and rectify the situation." (*Id.* at 96). Approximately thirty seconds later, as

Constantine was walking up the driveway to call the police, Blackburn came around the corner with a gun continuing to scream at Rush to "get the f**k out", cocked the firearm and discharged it over Rush's head from an estimated ten to twenty yards away. (*Id.* at 97). Blackburn then pointed the gun at Rush and again told him to "get the f**k out." (*Id.* at 99).

Rush testified that they attempted to show Blackburn the paperwork and never said anything threatening to him. They had not hooked up their truck to the trailer. Rush and Constantine immediately left the Property after Blackburn shot the gun, continuing to call the PSP and staying up the road until the PSP's arrival.

**2.**

Similarly, Constantine testified that on the day of the incident, he and Rush went to the Property at approximately eight or nine in the morning to repossess the trailer. Rush was driving and Constantine had the paperwork. They pulled the truck in front of the trailer. Constantine wanted to speak with Walter to let him know why they were there and what his options were to avoid repossession. He saw Helen and told her that he was from Northeast Investigative Agency and working on behalf of Community Bank N.A. and that he was looking for Walter. She advised him that she did not believe Walter was there before going back to her residence.

Upon finding out that Walter was not there, Constantine went to Rush to discuss what they should do since they both wanted Walter to be present

before they repossessed the tailer because if Walter had appeared and made a deal with the bank, they would have just left. He explained that because this was a trailer and not a car or truck, they would not just hook it up and drive away but would have to take a number of additional steps before it could be repossessed. They would also give the owner an opportunity to remove any items from inside the trailer.

However, before they could have any conversation about how to proceed, he testified that Blackburn came out of his residence repeatedly yelling at them to "get the f**k out of here." (*Id.* at 134). Constantine asked Blackburn if he was Walter, gave Blackburn his business card and tried to deescalate the situation to explain why he and Rush were there. Blackburn never told Constantine who he was, whether he owned the Property or if he was not Walter or where Walter was. Instead, Blackburn responded by continuing to repeatedly say, "get the f**k out of here," and threatening that if they did not leave he was "going to blow holes all up the side of your truck." (*See id.* at 135).

As Blackburn walked away toward his residence, Rush told Constantine to call the PSP, whereupon he walked down the driveway to do so because of poor cell phone reception. While he was waiting on hold to talk to the PSP, he turned and saw Blackburn come outside with a pistol and walk directly toward Rush, who was still at the trailer. At this time, Helen was on the trailer steps. Constantine yelled to Rush "to get the f**k in the truck and let's go."

(*Id.* at 136). As Constantine was walking toward Rush he saw Blackburn point the pistol at Rush from approximately five to ten feet away and discharge it barely over Rush's head. Constantine testified that after Blackburn discharged the gun, Constantine was screaming at Rush to get in the truck and pick him up from where he was now taking cover, which he did. The men left the Property and waited down the street for the PSP's arrival.

**3.**

Helen testified that from her residence on the Property, she first observed the truck driven by Rush and Constantine in the shared driveway. She then observed a man in a baseball cap come out of Walter's unlocked trailer while there was one person still in the truck. She assumed they were looking for someone so she went outside and asked if she could help them. The man who came out of the trailer approached her with paperwork and said he was looking for Walter. She testified that the men did not tell her the purpose of being on the Property, and after telling them that Walter was not present, she returned to her residence.

She testified that she was not sure why, but she went out a second time and heard the man with the ballcap on the phone saying he was threatened with a gun, but she did not see anyone else outside. She walked around the Property to see if anyone else was there and went into Walter's trailer. When she came out, she saw Blackburn just standing there, that the truck had been moved and that the second gentleman from the truck was attempting to hitch

up the trailer to it. At that point, she heard Blackburn ask the man to stop and wait for Walter to get home. When the man did not stop, she saw Blackburn's arm go into the air above his head and she heard a shot. The two men got in their truck and left the Property and parked up the street to wait for the PSP to arrive. Helen testified that neither the truck nor the men's clothing had any identifying insignia.

**4.**

Blackburn testified that he was at home in John's residence on the day of the incident. From the kitchen window, he observed the truck drive from the driveway, into the side yard and around to the back of the Property. When Blackburn went outside, he observed Rush at the trailer hitch intending to hookup their truck and Constantine "rooting through drawers" in Walter's trailer. (N.T. Trial, 7/26/22, at 114). Blackburn stated that he blew up and told the men to get out of there, using "multiple profanities." (*Id.*). He maintained that there was no identifying information on the truck or the two men.

He stated that when he started screaming, the individual came out of the trailer and told Blackburn that he was there to repossess it. Blackburn told the men to get off the Property and come back when Walter was there. When the men told him that they were going to take the trailer, Blackburn told them that he had a gun that he would go get to "blow holes in your truck"

if they did not leave. (*Id.* at 115). One of the men told him he was going to call the police and walked away with his phone.

At that point, Blackburn believed the man was calling the police, but went inside and got his gun instead of waiting for their arrival because the other individual was still at the hitch and the men "did not desist and cease what they were trying to do." (*Id.* at 137). Blackburn testified that when he returned from the residence, he showed the men the gun and told them to leave and when the did not do so, he discharged the weapon at a forty-five-degree angle towards a tree approximately twenty feet over the men's heads. He told the men he was "going to turn their truck into Swiss cheese if they didn't get out of [his] yard." (*Id.* at 120-21). Rush and Constantine left the Property and waited for the PSP down the street.

Blackburn said that he returned the gun to his brother John, grabbed a loaded shotgun and waited in a pavilion on the Property in case the two men returned. Blackburn explained that he believed shooting the gun was necessary because "they weren't listening. They kept playing with the jack. You know, the hitch, trying to get it hooked up. And I was like hey, get off of my property. You have business with Walter, deal with Walter. Wait for him to come back." (*Id.* at 121-22).

**B.**

Blackburn requested the SSJI instruction for the defense of justification: defense of property (castle doctrine)[2] and the Commonwealth requested justification: use of force to for the protection of property.[3] Blackburn's counsel argued that his proposed instruction was appropriate because it directed the jury to determine first if deadly force was used when Blackburn shot the gun and that the Commonwealth had to prove he unreasonably believed that he needed to use force to protect the Property. (**See id.** at 102-05). The Commonwealth responded that discharging the firearm was *per se* potential deadly force that would trigger the dwelling part of the castle doctrine, which was inapplicable where there was no allegation that Blackburn was protecting the residence. (**See** 104-05). The court decided that Blackburn's proposed instruction was confusing and not on point, electing to give the Commonwealth's requested charge. Specifically, in explaining justification and use of a deadly weapon, it advised the jury:

> I'm going to review with you justification, use of less than deadly force to prevent … the commission of a crime. In this case, the evidence was introduced that [Blackburn] used forced, force against Stanton Rush to prevent him from committing a crime involving or threatening damage to or loss or property. Special rules apply in determining whether [Blackburn]'s use of force in these circumstances was justified. The Commonwealth has the burden of disproving the defense of justification. That means, you

---

[2] Pennsylvania Suggested Standard Criminal Jury Instruction 9.503.

[3] Pennsylvania Suggested Standard Criminal Jury Instruction 9.500.

cannot find [Blackburn] guilty unless the evidence convinces you beyond a reasonable doubt that [Blackburn] did not reasonably believe that the force he used was immediately necessary to prevent Stanton Rush from committing a crime involving or threatening damage to or the loss of property.

(*Id.* at 182-83).

The same day, the jury returned a verdict finding Blackburn guilty of the above-listed charges and that he possessed a deadly weapon for commission of terroristic threats and simple assault. (*See id.* at 195-96).

On September 14, 2022, with the assistance of a Presentence Investigative Report (PSI), the court sentenced Blackburn to six to twenty-four months' incarceration on the terroristic threats charge, six to twenty-four months' incarceration for the simple assault and six to twelve months' incarceration on harassment, with the charges to run consecutively, for an aggregate term of not less than eighteen nor more than sixty months' incarceration. (*See* N.T., 9/14/22, at 9-12). The initial sentencing order misidentified the aggregate term of incarceration and on September 15, 2022, the court entered an amended order with the correct aggregate sentence.

After the court denied Blackburn's post-sentence motion for reconsideration/furlough, Blackburn timely appealed and filed a court-ordered statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b).

Blackburn raises three issues for our review: (1) whether the court erred in giving the justification instruction; (2) whether the court abused its discretion in imposing an aggregate sentence at the high end of the standard

guideline sentences and ran all sentences consecutively; and (3) whether the court abused its discretion in imposing his sentence "without properly weighing mitigating factors." (Blackburn's Brief, at 11-12).

## II.

## A.

Blackburn argues that the trial court abused its discretion in giving the justification defense jury instruction[4] that it did because he presented sufficient facts to justify the castle doctrine defense of property jury instruction, "which would have clearly presented the law to the jury." (*See id.* at 25).

In reviewing a challenge to jury instructions, we do not "rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." ***Commonwealth***

---

[4] It is well-settled that:

> [O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

***Commonwealth v. Williams***, 274 A.3d 722, 735-36 (Pa. Super. 2022) (quotation marks and citations omitted).

*v. Johnson*, 289 A.3d 959, 1002 (Pa. 2023) (citation omitted). The Suggested Standard Jury Instructions are not binding and are guides only for courts to use in crafting appropriate jury instructions. *See Commonwealth v. Simpson*, 66 A.3d 253, 274 n.24 (Pa. 2013). Further, "[t]he trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." *Commonwealth v. Brown*, 911 A.2d 576, 583 (Pa. Super. 2006), *appeal denied*, 920 A.2d 830 (Pa. 2007) (citation omitted). Hence, we must determine whether the court's refusal to give the castle doctrine justification instruction constituted an abuse of discretion and, if so, whether Blackburn suffered prejudice.

> The castle doctrine is an evidentiary means by which a defendant may attempt to prove justification by self-defense. Thus, it is subject to a similar, initial standard by which courts must assess the appropriateness of a self-defense instruction, namely, that a valid claim of self-defense [or the castle doctrine] must be made out as a matter of law, and this determination must be made by the trial judge.

*Commonwealth v. Cannavo*, 199 A.3d 1282, 1287 (Pa. Super. 2018), *appeal denied*, 217 A.3d 180 (Pa. 2019) (citation and internal quotation marks omitted). The doctrine was codified in Pennsylvania at 18 Pa.C.S. § 907 and reads in pertinent part:

> **(a) Use of force justifiable for protection of property.**—The use of force upon or toward the person of another is justifiable when the actor believes that such force is immediately necessary:
>
> (1) to prevent or terminate an unlawful entry or other trespass upon land or a trespass against or the **unlawful** carrying

away of tangible movable property, if such land or movable property is, or is believed by the actor to be, in his possession or in the possession of another person for whose protection he acts[.]

\* \* \*

**(c) Limitations on justifiable use of force.—**

(1) The use of force is justifiable under this section only if the actor first requests the person against whom such force is used to desist from his interference with the property, unless the actor believes that:

(i) such request would be useless;

(ii) it would be dangerous to himself or another person to make the request; or

(iii) substantial harm will be done to the physical condition of the property which is sought to be protected before the request can effectively be made.

\* \* \*

(4) (i) The use of deadly force is justifiable under this section if:

(A) there has been an entry into the actor's dwelling.[5]

18 Pa.C.S. § 507(a)(1), (c)(1), (c)(4)(i)(A) (emphasis added).

Deadly force is defined as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury." 18 Pa.C.S. § 501. "[T]he standards for permitting a castle-doctrine instruction

---

[5] Since there was no claim involving Blackburn's residence, this portion of the instruction is clearly inapplicable.

are the same as when reviewing whether a self-defense instruction is appropriate. Thus, a court does not necessarily assess burdens of proof when considering the applicability of a castle-doctrine instruction, but instead whether there was any evidence to justify the instruction." ***Commonwealth v. Cannavo***, 199 A.3d 1282, 1288 (Pa. Super. 2018) (citation omitted).

Here, Blackburn was not entitled to the castle doctrine instruction because Blackburn's own testimony, as well as that of Rush and Constantine, reveals that they told him that they were there to repossess Walter's trailer and needed to talk with him, not unlawfully taking moveable property. (***See*** N.T. Trial, 7/25/22, at 98, 234-35); (N.T. Trial, 7/26/22, at 114-15). Further, Blackburn testified that he knew Constantine was calling the police. (***See*** N.T. Trial, 7/26/22, at 118, 136). Despite this knowledge, Blackburn admits that he went inside, got his gun, threatened Rush with it and issued a warning shot because the men "did not desist and cease what they were trying to do." (***Id.*** at 137); (***see id.*** at 116, 118). This use of reckless force against Constantine and Rush, who had identified themselves and attempted to provide Blackburn with supporting paperwork, was not justified where, despite his testimony that the men were stealing Walter's property, he was aware that they were there lawfully. ***See Commonwealth v. Brockington***, 230 A.3d 1209, 1216 (Pa. Super. 2020) ("The inherent danger caused by the reckless discharge of a firearm into the air, and the obvious ricochet effect that may occur when bullets fall to the ground, are matters of common sense.") (citation omitted).

In fact, Blackburn testified that he shot the warning shot because the men were not listening to him and he wanted them to wait to talk to Walter, not because he believed they were unlawfully taking the trailer. (*See id.* at 118-22). Therefore, the trial court did not abuse its discretion by denying Blackburn's request for the castle doctrine instruction where there is no evidence that Rush and Constantine were unlawfully trying to steal moveable property.

Further, Blackburn has failed to establish that he suffered any prejudice, *i.e.*, that if the trial court had given the castle doctrine instruction, the jury would have acquitted him. The jury instruction crafted by the trial court made it clear that it was the Commonwealth's burden to prove beyond a reasonable doubt that Blackburn did not reasonably believe that the force he used was immediately necessary to prevent Rush from committing a crime involving or threatening damage to or the loss of property. (*See* N.T. Trial, 7/26/22, at 182-83). This issue lacks merit.

**B.**

Blackburn contends that the trial court abused its discretion in imposing an excessive sentence. He argues that the court failed to properly consider the sentencing guideline factors such as his lack of a criminal history and that he does not pose a risk to the community or victims before imposing an aggregate sentence at the high end of the standard range composed of consecutive terms of imprisonment. He also maintains that the court failed to

consider certain mitigating factors such as his significant health issues, that he has family support and does not pose a flight risk.[6]

This claim challenges the discretionary aspects of sentence. *See Commonwealth v. Prisk*, 13 A.3d 526, 532 (Pa. Super. 2011) ("[A]llegation of excessiveness due to imposition of consecutive sentences implicates discretionary aspects of sentencing.") (citation omitted); *Commonwealth v. Lee*, 876 A.2d 408, 411 (Pa. Super. 2005) (claim that sentence is manifestly excessive goes to discretionary aspects of sentencing); *Commonwealth v. Sanchez*, 848 A.2d 977, 986 (Pa. Super. 2004) (any claim of misapplication of sentencing guidelines constitutes a challenge to the discretionary aspects of a sentence); *Commonwealth v. Cruz-Centano*, 668 A.2d 536, 545 (Pa. Super. 1995), *appeal denied*, 676 A.2d 1195 (Pa. 1996) (claim that sentencing court failed to consider certain mitigating factor implicates the discretionary aspects of sentence).

"The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal." *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1265 (Pa. Super. 2014), *appeal denied*, 104 A.3d 1 (Pa. 2014). "An appellant must satisfy a four-part

---

[6] We have combined Blackburn's two sentencing issues because they both raise discretionary aspects claims. The trial court states that Blackburn waived his mitigating factors argument for his failure to raise it at sentencing. However, even if they are waived, as stated above, we conclude that Blackburn is due no relief as a substantive matter.

test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence." *Id.* We conduct this four-part test to determine whether:

> (1) The appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

*Commonwealth v. Baker*, 72 A.3d 652, 662 (Pa. Super. 2013), *appeal denied*, 86 A.3d 231 (Pa. 2014) (citation omitted).

In this case, Blackburn timely filed a post sentence motion and notice of appeal and included a Rule 2119(f) statement in his brief. Therefore, we will consider whether he has raised a substantial question.

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Ali*, 197 A.3d 742, 760 (Pa. Super. 2018), *appeal denied*, 207 A.3d 911 (Pa. 2019). "A defendant presents a substantial question when he sets forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." *Commonwealth v. Dodge*, 77 A.3d 1263, 1268 (Pa. Super. 2013) (quotation marks and citations omitted), *appeal denied*, 91 A.3d 161 (Pa. 2014).

Blackburn argues that his consecutive standard range sentence is excessive and the court failed to consider certain sentencing factors, including that the sentence was not necessary to protect the public and his lack of a

criminal history. He also claims that the court failed to consider mitigating factors such as his significant ties to the community, the support of his family and his health issues. (*See* Blackburn's Brief, at 31). These claims raise substantial questions. *See Commonwealth v. Hill*, 210 A.3d 1104, 1116 (Pa. Super. 2019) (finding a substantial question where the appellant averred that the trial court failed to consider certain sentencing factors in conjunction with an assertion that the sentence imposed was excessive); *see also Commonwealth v. Bonner*, 135 A.3d 592, 604 (Pa. Super. 2016) (holding that a claim that a standard range consecutive sentence was excessive and the trial court failed to consider rehabilitative needs raises substantial a question); *Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2015) (observing that "[t]his Court has held that an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question"). Hence, we will proceed to address the merits of Blackburn's discretionary aspects of sentence claim.

Our standard of review of a discretionary sentencing claim is well-established:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Bankes*, 286 A.3d 1302, 1307 (Pa. Super. 2022) (citation omitted). "[W]hen imposing sentence, the trial court is granted broad discretion, as it is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Mulkin*, 228 A.3d 913, 917 (Pa. Super. 2020).

When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. *See Commonwealth v. Taylor*, 277 A.3d 577, 593 (Pa. Super. 2022). In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation. *Id.* However, when a PSI exists, we "presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Conte*, 198 A.3d 1169, 1177 (Pa. Super. 2018) (emphasis added; citation omitted). Stated differently, where a sentencing court is informed by a PSI, "it is presumed that the court is aware of all appropriate sentencing factors and considerations, and where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Ventura*, 975 A.2d 1128, 1135 (Pa. Super. 2009) (citation omitted).

Here, Blackburn concedes that his sentence falls within the standard range of the sentencing guidelines, *albeit* at the high end. He nevertheless

contends that his sentence was clearly excessive given that it was not individualized and the court failed to properly weigh mitigating factors.

We first note that the trial court possessed a PSI at sentencing and, therefore, the court is presumed to be fully aware of all appropriate sentencing factors and considerations. Additionally, the court presided over all matters in this case and had an opportunity to observe Blackburn and was aware of all pertinent circumstances.

At the sentencing hearing, immediately after imposing the sentence at each count, the trial court succinctly explained its reasoning as follows: "The reasons for sentence, this sentence is within the standard range guidelines. Any lesser of a sentence would depreciate the seriousness of the [Blackburn]'s actions and a firearm was used and discharged in the course of this offense." (N.T. Sentencing, 9/14/22, at 9-10, 11, 12). In its opinion, the court further explains:

> In sentencing [Blackburn], this court relied on an extensive [PSI]. In preparing the [PSI], Wyoming County Adult Probation met with [Blackburn] who indicated he did not agree with the trial findings and that he did not get a fair trial. [Blackburn] shot a loaded gun … and aimed it at Mr. Rush despite knowing that the Pennsylvania State Police had been summoned to the property. Although it was the same course of conduct, there were two (2) separate victims, Mr. Rush and Mr. Constantine. At the time of sentencing, [Blackburn] showed little to no remorse for his actions.
>
> * * *
>
> On appeal, [Blackburn] asserts that this court … did not properly weigh mitigating factors at the time of sentencing such as [his] significant health concerns, that [he] did not pose a threat

- 20 -

to the community, [his] family support and presented no flight risk. At the time of sentence, as the record reflects, these issues were not raised. At the time of sentencing, the court was provided with a note from [Blackburn]'s physician listing his medical conditions, which was considered by the court prior to rendering sentence.

(Trial Court Opinion, 11/17/22, at 4-5) (record citation and unnecessary capitalization omitted); (*see* N.T. Sentencing, at 4-9).

Based on the foregoing, under the totality of the circumstances, Blackburn's standard range consecutive sentences resulting in an aggregate term of not less than six nor more than twenty-four months were neither excessive nor unreasonable. We discern no abuse of discretion by the trial court where it had the benefit of a PSI, presided over all matters, was fully aware of the circumstances, was familiar with Blackburn and was in the best position to determine the appropriate sentence. *See*, *e.g.*, *Moury*, 992 A.2d at 171 (holding that "where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code," and the sentence is not unreasonable where the trial court had the benefit of a PSI and imposed a standard range sentence). This issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>07/27/2023</u>