J-A17043-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RASHEED MALCOLM | : | |
| | : | |
| Appellant | : | No. 954 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 28, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001309-2020

BEFORE: KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:                    **FILED NOVEMBER 14, 2023**

Appellant, Rasheed Malcolm, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for first-degree murder, firearms not to be carried without a license, carrying firearms on public streets in Philadelphia, and possessing instruments of crime.[1] We affirm.

In its opinion, the trial court set forth the relevant facts of this case as follows:

> This case stems from the murder of Kevin Harris on December 22, 2018.
>
> Police Officer Ankur Rana testified that on the evening of December 22, 2018, while on patrol around 62nd and Arch

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a); 6106; 6108; and 907, respectively.

Street, Philadelphia, Pa., he heard multiple gunshots and saw people running. When Officer Rana arrived at the scene, he observed a male, later identified as Kevin Harris (the "decedent"), laying non-responsive on the ground on 62nd and Market Street. He and his partner, Officer Garced, placed the decedent into Officer Garced's SUV, and transported him to Presbyterian Hospital, where he was pronounced dead.

Police Officer Roodly Phanor testified that upon arriving at the scene, he observed a male, later identified as Donny Williams, hunched over with a gunshot wound in his midsection. Officer Phanor quickly drove Mr. Williams to Presbyterian Hospital. Williams survived his injuries.

Detective Thorsten Lucke, of the Philadelphia Police Homicide Unit, testified that he assisted in recovering surveillance footage and cell phone data for the investigation. Detective Lucke presented a video compilation of the surveillance footage recovered from the scene which consisted of two (2) systems from Kif's Bar at 6142 Market Street and one (1) system from Peerless Pest Control at 61[50] Market Street. The video footage depicts [Appellant] wearing a gray zipper hoodie, black boots, black pants, and wired white earbuds. [Appellant] was first seen on the footage circling the block multiple times, on which the incident occurred, ten (10) minutes before decedent was shot. The video footage then shows [Appellant] walking through a crowd that had exited a bar, coming up behind decedent, shooting him twice at close range, and then fleeing. As [Appellant] is running away, a gun can be seen in his right hand.

Ramona Harris, decedent's aunt, testified that on December 21, 2018, she was with a group of friends at Kif's [B]ar located at 6142 Market Street to celebrate her birthday and that of her twin sister. The decedent arrived with friends, and joined their party. When Kif's bar closed, the group formed a circle near the bar on the sidewalk, and were "saying their goodbyes," when [Ms.] Harris heard gunshots and ducked. When the shooting stopped, she checked everyone and discovered decedent was nonresponsive. She recalled seeing two shooters during the incident; one was wearing a black outfit and had black dreads, and the other

- 2 -

was tall, skinny and in a gray hoodie.

Police Officer Robert Lamanna testified to being assigned to the 18th Police District from July of 2015, up until the time of the incident. As a patrol officer, he became familiar with the area and its residents. Officer Lamanna knew [Appellant] from 2015 or 2016, from seeing him in the 18th District and on social media. The surveillance video of the incident was played for Officer Lamanna, after which he identified [Appellant] as the perpetrator of the murder, stating, "[y]es, I believe that to be [Appellant] in the gray hooded sweatshirt, dark pants, black Timberland-style boots." His identification was "[b]ased on some of the facial features, the beard you can observe, the way he walks, his height, especially." Officer Lamanna explained that [Appellant] had a distinct gait and was tall, standing about six feet seven inches.

Police Officer Lamont Fox, from the Crime Scene Unit, testified that on December 22, 2018, the day of the incident, he processed the crime scene. Officer Fox recovered eleven fired cartridge casings ("FCCs") from the crime scene: six FCCs were .380 and five were (9) nine millimeter. A wallet and jacket were also recovered from the crime scene.

Police Officer Robert Stott, from the Philadelphia Firearms Identification Unit, testified that he performed an analysis on the FCCs. Officer Stott concluded that the FCCs were fired from two different guns.

Dr. Eric Little, from the Philadelphia Medical Examiner's Office, testified that he reviewed the photographs and autopsy report written by Dr. Brown, who examined decedent. The autopsy revealed that the decedent had been shot two times, once in the head and once in the chest. No bullets were recovered from decedent. Dr. Little opined that the decedent's cause of death was multiple gunshot wounds, and the manner of death was homicide.

Detective James Burns, Philadelphia Homicide Unit, testified to being assigned to the instant case. Directly after the homicide, he was unable to find anyone identifying decedent's shooter. Detective Burns initially spoke to the surviving shooting victim, Donny Williams, at the hospital,

but has since been unable to locate or talk to Mr. Williams. Detective Burns had trouble locating witnesses or having them cooperate with the investigation, and one [witness], Tyreek Camp, was murdered in the Fall of 2019. After recovering all of the surveillance video of the incident, Detective Burns sent out a patrol alert, that included a screen shot from the video of the individual suspected of the homicide. Officer Lamanna recognized the suspect as [Appellant] from this patrol alert.

Select portions of [Appellant's] videotaped interrogation were played for the jury, where Detective Burns, with a partner, interviewed him. [Appellant] expressed his innocence.

During the interrogation, [Appellant] gave permission to Detective Burns to search his bedroom at 5915 Race Street, for items relating to the incident. Recovered from the search of the bedroom was a gray hoodie, black boots, and a pair of white iPhone corded headphones. The gray hoodie and black boots were consistent with the sweatshirt and boots depicted in the surveillance video. During the interrogation, [Appellant] denied that the hoodie was his, rather a friend's, but [Appellant] never revealed its owner.

Forensic Scientist, Hung Le, testified that gunshot residue was discovered on the right sleeve of the gray hoodie taken from [Appellant's] bedroom.

Forensic Scientist, Jane Hess, testified that the gray hoodie contained DNA of three individuals, at least one of whom was male. However, the test was inconclusive regarding whether the DNA belonged to [Appellant]. Dr. Hess took DNA samples from a pair of boots and earbuds recovered in [Appellant's] room, which also resulted in inconclusive findings.

Counsel stipulated to the fact that if recalled to the stand, Detective Thorsten Lucke, who is an expert in cellphone extraction and analysis, would testify that the two phone numbers given by [Appellant] during the interrogation, were not in use before 2019. [Appellant] also provided Detective Burns with an iCloud account to review, but the account was inaccessible due to it being previously deactivated.

(Trial Court Opinion, filed 8/17/22, at 5-8) (internal record citations omitted).

Procedurally, a jury convicted Appellant on March 28, 2022, of the above-mentioned crimes. The court sentenced Appellant that day to life imprisonment without the possibility of parole for murder and imposed no further penalty for the remaining crimes. Appellant timely filed a notice of appeal that same day. On April 25, 2022, the court ordered Appellant to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b). Following an extension of time, Appellant filed his Rule 1925(b) statement on June 12, 2022.

Appellant raises four issues for our review:

> Did not the [trial] court err and abuse its discretion in overruling counsel's objection to the prosecutor's burden-shifting argument and improper reference to trial counsel's mindset, in violation of Pennsylvania law, and the Fifth, Sixth and Fourteenth Amendments to the Constitution?

> Did not the [trial] court err and abuse its discretion in refusing trial counsel's request for a **Kloiber**[2] charge, where the [trial] court itself acknowledged that the video from which the identification was made was "not clear," was so grainy at the point of the shooting that "no one [could] make an identification," and that the alleged perpetrator's face is "hidden" for the remainder of the video, thus satisfying **Kloiber**'s requirement that the jury could have inferred that the witness did not "clearly observe" the assailant.

> Did not the [trial] court err and abuse its discretion by overruling trial counsel's objection to the detectives'

---

[2] **Commonwealth v. Kloiber**, 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954).

opinions expressed on the surveillance video that [Appellant] was guilty, and thus his protestations of innocence false.

Did not the [trial] court err and abuse its discretion by permitting lay opinion testimony of a police officer, identifying [Appellant] as the alleged perpetrator in a surveillance video, based on factors the jurors could easily see for themselves, or that are so common to the population at large as to render them far less probative than prejudicial, rendering the testimony unhelpful to the determination of a fact at issue, in violation of Pa.R.E. 701.

(Appellant's Brief at 5-6).

In his first issue, Appellant argues that the prosecutor stated during closing arguments that defense counsel chose not to show the jury the surveillance video because defense counsel did not want the jury to "keep looking at the picture of [Appellant]" because "the more you see it, the more sure you are that [Appellant] shot [Decedent]." (*Id.* at 36) (citing N.T. Trial, 3/25/22, at 117-18). Appellant claims that this statement by the prosecutor shifted the burden of proof in violation of Appellant's constitutional rights. Appellant insists the prosecutor's statement served only one purpose—to demonstrate that counsel's decision not to show the video was probative of Appellant's guilt. Appellant contends that "[s]uch a direct condemnation of a defendant's decision not to present certain evidence violates the due process clause and compels reversal." (*Id.*) Appellant emphasizes that he objected to the improper comment, but the court overruled his objection. Appellant maintains that the video evidence was of paramount importance in this case, particularly where there were no eyewitnesses who testified. Appellant

submits that "[f]or this reason, prosecution commentary highlighting the defense 'failure' to prove its case with the video—which can be no failure at all since the defense has no obligation to prove its case—is uniquely damaging when the video was the main event at the trial." (*Id.* at 39).

Further, Appellant claims the prosecutor's comment suggested to the jury that defense counsel believed Appellant was guilty. Appellant avers the prosecutor's statement not only suggested defense counsel's state of mind regarding Appellant's guilt, but also suggested that defense counsel sought to deceive the jury by limiting its access to the video. Appellant insists that the prosecutor's comment encouraged the jury to evaluate the non-record considerations of defense counsel's mindset and motives in determining Appellant's guilt or innocence. Appellant maintains the prosecutor's comment was prejudicial and cannot be considered harmless. Because the prosecutor also highlighted that Appellant had repeatedly objected to the video evidence during the Commonwealth's case-in-chief, Appellant contends the prosecutor improperly commented on defense counsel's failure to present evidence. (Appellant's Reply Brief at 3). Appellant concludes the prosecutor committed misconduct, and this Court must grant relief. We disagree.

With respect to a claim of prosecutorial misconduct, this Court has explained:

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion.

In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.

Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [Appellant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

\* \* \*

In cases where an appellant alleges that his Fifth Amendment right to remain silent was improperly referenced at trial, the Pennsylvania Supreme Court has emphasized the mere revelation of silence does not establish innate prejudice.

**Commonwealth v. Harris**, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007) (internal citations and quotation marks omitted).

Further:

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial. Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Commonwealth v. Eilliott*, 622 Pa. 236, 282, 80 A.3d 415, 443 (2013), *cert. denied*, 574 U.S. 828, 135 S.Ct. 50, 190 L.Ed.2d 54 (2014) (internal citation omitted).

Instantly, during the prosecutor's closing argument, she emphasized the importance of the surveillance video evidence depicting Appellant as the shooter. Defense counsel objected to the prosecutor's remarks as follows:

> [THE PROSECUTOR:] What you can see, [Appellant] is significantly taller than everybody else. This video gives you everything. But it's not everything, because there's substantial corroboration in this particular case, and that comes from the physical evidence. Silent witnesses, things that can't lie. And let me be clear; video is physical evidence. The video doesn't lie. You determine what happens in the video. That is what it is.
>
> Why do you think [defense counsel] didn't actually show you the video? He could have showed you the video. He chose not to. Why? He doesn't want you to keep looking at the picture of [Appellant] up on the screen. How many times has he objected to a picture of [Appellant]?
>
> [DEFENSE COUNSEL:] I object to that.
>
> [THE COURT:] Overruled. Its argument.
>
> [THE PROSECUTOR:] He doesn't want you to see [Appellant's] face because the more you see it, the more sure you are that [Appellant] shot [Decedent].

(N.T. Trial, 3/25/22, at 117-18). Defense counsel made no further objection to the remainder of the prosecutor's closing argument.

Initially, Appellant did not object following the prosecutor's statement: "He doesn't want you to see [Appellant's] face because the more you see it, the more sure you are that [Appellant] shot [Decedent]." Thus, Appellant's

claim that the prosecutor's comment improperly suggested defense counsel's state of mind and that defense counsel believed Appellant was guilty, is waived on appeal. *See Commonwealth v. Tucker*, 143 A.3d 955 (Pa.Super. 2016), *appeal denied*, 641 Pa. 63, 165 A.3d 895 (2017) (explaining that failure to make timely and specific objection before trial court at appropriate stage of proceedings will result in waiver of issue on appeal). Consequently, we are left to consider only the impact of the prosecutor's allegedly improper remarks stating: "Why do you think [defense counsel] didn't actually show you the video? He could have showed you the video. He chose not to. Why? He doesn't want you to keep looking at the picture of [Appellant] up on the screen. How many times has he objected to a picture of [Appellant]?" (N.T. Trial, 3/25/22, at 117).

The trial court evaluated this claim as follows:

> During closing argument, Defense counsel asserted that a proper identification could not be made from the surveillance video, stating: "…the video that they compiled, and edited and put it together, no matter how many times its been shown and how many times attempted to show that one still picture, the ultimate factor is that none of them, none of the video shows the face of or in any way shows anything at all that is [Appellant]. Not that he resembles somebody; that it is [Appellant]." N.T., 3/25/22, [61-62].

> The statement [Appellant] claims to be prosecutorial misconduct was made in fair response to impress upon the jury that the video evidence did establish the identification of [Appellant] as the perpetrator of the murder. The Commonwealth stated[:] "[W]hy do you think [defense counsel] didn't actually show you the video? He could have showed you the video. He chose not to. Why? He doesn't want you to keep looking at the picture of [Appellant] up on

- 10 -

the screen. How many times has he objected to a picture of [Appellant]?" N.T., 3/25/22, 117.

Defense counsel's closing argument attempted to diminish the identification of [Appellant] by Officer Lamanna made from the surveillance video. In fair response, the Commonwealth countered that the identification from the video was powerful evidence that the defense was downplaying. The prosecutor is permitted to use oratorical flair, which she did, by stating that the defense would have made use of the video if it depicted a shooter who was not [Appellant]. This is not burden shifting or commenting on silence, it is simply fair rebuttal to defense argument.

The court did not abuse its discretion in overruling the objection, nor did the Commonwealth commit prosecutorial misconduct.

(Trial Court Opinion at 15-16).

The record supports the court's analysis. Throughout trial, Appellant argued that the video evidence was not inculpatory because the video quality was too poor to yield an identification of the shooter. In closing arguments, the defense insisted that the video was not inculpatory. In fair response, the prosecutor used a bit of "oratorical flair" to suggest to the jury that if Appellant was not on the video as he claimed, defense counsel would not have objected to presentation of the video evidence. Given the theories of the case during trial and the arguments from both parties in closing, we see no abuse of discretion in the court's ruling on Appellant's objection to the prosecutor's remarks. Notably, the prosecutor's closing argument spanned 40 pages. (*See* N.T. Trial, 3/25/22, at 90-130). On this record, we cannot say that the challenged portion of the prosecutor's remarks, when read in context of the

- 11 -

entire closing argument, prejudiced the jurors and formed in their minds a fixed bias and hostility toward Appellant such that the jurors could not weigh the evidence and render a true verdict. **See Elliott, supra**; **Harris, supra**.

Moreover, any prejudicial effect from the prosecutor's statement was cured by the trial court's general instructions to the jury following closing arguments that their determination should not be based on "which attorney you think makes the better speech"; that the jury is not "bound by the recollection of counsel in their arguments"; and that "it is the Commonwealth that always has the burden of proving each and every element of the crimes charged[.]" (**See** N.T. Trial, 3/25/22, at 133-35). **See also Commonwealth v. Hawkins**, 549 Pa. 352, 388, 701 A.2d 492, 510 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998) (stating any prejudicial effect from prosecutor's statement was cured by trial court's general cautionary instruction to jury that closing arguments were not evidence and that Commonwealth always bore burden of proof because defendant did not have to prove he is not guilty; law presumes juries follow court's instructions as to applicable law). Therefore, Appellant's first issue on appeal merits no relief.

In his second issue, Appellant argues that trial counsel requested a charge on identification that "incorporated" the considerations in **Kloiber**. (Appellant's Brief at 46). Appellant asserts that defense counsel noted the "degraded" quality of the surveillance video and that "the issue of

identification" was in play. (*Id.*) Appellant claims the court denied the requested charge because *Kloiber* does not apply in scenarios where the identifying witness knows the person identified; here, Officer Lammana claimed he knew Appellant from prior interactions. Appellant posits that the law requires a *Kloiber* charge when the witness did not clearly observe the suspect, regardless of whether the witness might have been acquainted with the suspect. Appellant contends the court also denied the charge because the court characterized defense counsel's strategy as claiming the officer was lying, and not that the officer had misidentified Appellant. Further, Appellant insists the court admitted that the video was grainy, and that no one could make an identification from the actual shooting part of the video. Appellant emphasizes that the only identification witness at trial was Officer Lamanna. Appellant maintains it was crucial for the court to give a *Kloiber* instruction, telling the jury that if it found the video did not offer the viewer the opportunity to "clearly observe" the perpetrator, then the identification should be received with caution.

Appellant highlights that the jury struggled with identification in this case, based on the jury's request to see a side-by-side still of the video and Appellant, after which the jury still could not reach a verdict. Appellant emphasizes that the jury then asked to resume deliberations after the weekend. Absent a *Kloiber* instruction, Appellant insists the jury was free to consider the officer's more confident opinion, unencumbered by the "caution"

the court should have directed them to exercise. Given the lack of evidence against Appellant in this case, Appellant claims the court's failure to give the **Kloiber** instruction could not have been harmless. Appellant concludes the court erred by denying his requested **Kloiber** charge, and this Court must grant relief. We disagree.

Preliminarily, "to preserve a claim that a jury instruction was erroneously given, the [a]ppellant must have objected to the charge at trial." **Commonwealth v. Parker**, 104 A.3d 17, 29 (Pa.Super. 2014), *appeal denied*, 632 Pa. 669, 117 A.3d 296 (2015). Our Supreme Court has explained:

> The pertinent rules [of criminal procedure] require a specific objection to the [jury] charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction. Although obligating counsel to take this additional step where a specific point for charge has been rejected may appear counterintuitive, as the requested instruction can be viewed as alerting the trial court to a defendant's substantive legal position, **it serves the salutary purpose of affording the court an opportunity to avoid or remediate potential error, thereby eliminating the need for appellate review of an otherwise correctable issue**. This is particularly so where a judge believes that the charge adequately covered the proposed points.

**Commonwealth v. Pressley**, 584 Pa. 624, 630-31, 887 A.2d 220, 224 (2005) (internal citations and footnotes omitted) (emphasis added). **See also** Pa.R.Crim.P. 647(c) (explaining that no portions of jury charge nor omissions from charge may be assigned error, unless specific objections are made thereto before jury retires to deliberate); **Parker, supra** (holding appellant waived challenge to jury instruction where he failed to object after court read

jury charge; although appellant expressly objected to flight charge at charging conference, defense counsel responded negatively when court asked if any additions or corrections to jury charge needed to be made after court issued jury instructions); *Commonwealth v. Melton*, No. 849 EDA 2018 (Pa.Super. filed Apr. 27, 2020) (unpublished memorandum),[3] *appeal denied*, 662 Pa. 489, 240 A.3d 109 (2020) (holding appellant waived challenge to court's failure to give requested *corpus delicti* instruction; although appellant submitted proposed point for charge regarding *corpus delicti* instruction and initially objected to jury instructions, appellant failed to object to court's supplemental instructions which had inadvertently omitted requested instruction; appellant's failure to object to supplemental instruction deprived court of opportunity to correct its error at appropriate stage of proceedings and to alleviate appellate issues).

Instantly, after the court issued its jury instructions, defense counsel had the following exchange with the court:

> [DEFENSE COUNSEL:]  …[I]s there any charge on identification here.
>
> [THE COURT:]  You didn't ask for a charge on identification; but what type of charge are you asking for?
>
> [DEFENSE COUNSEL:]  Well, I mean, the identification charge certainly lays out all of the factors.  Maybe they have the standard charge.  Not put together, you have sort of a

---

[3] *See* Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

*Kloiber* charge incorporated in identification.[4]

[THE COURT:] That's if someone doesn't know the individual. This police officer testified that [he] know[s] the individual, so that's why I didn't give a *Kloiber* charge. That's for an unknown identification; stranger on stranger identification.

[DEFENSE COUNSEL:] Your Honor, I would suggest that generally speaking with the video there has to be some explanation.

[THE COURT:] I actually said something to them at the time of the video that the officer made the identification, but it's up to them, you know. I will reiterate that. That's about it.

[THE PROSECUTOR:] I said that in my closing, too. I don't think they need to hear it.

[THE COURT:] Different than me.

[THE PROSECUTOR:] That's true. They already heard numerous times. They already heard it numerous times. It's not a difficult jury charge.

[THE COURT:] They have to decide whether they believe the police officer or not; not because of the lighting or any conditions. I mean, he says "I know him. That's him." They have to decide whether he's telling the

---

[4] In *Kloiber*, our Supreme Court held:

[W]here the witness is not in a position to clearly observe the assailant or he is not positive as to identity, or his positive statements as to identity are weakened by qualification, or by the failure to identify the defendant on one or more prior occasions, the accuracy of the identifications is so doubtful that the [c]ourt should warn the jury that the testimony as to identity must be received with caution.

*Kloiber, supra* at 424, 106 A.2d at 826-27.

truth or not.

[DEFENSE COUNSEL:] The video, the degrading part, all of that was talked about during the course of the closing. I think there's an issue as to identification. At least let the jury know.

[THE COURT:] If I did a **Kloiber** charge, the officers made an identification of [Appellant] in the video, and then it would basically say you have to take a look at the lighting, you know, all of these other things. You list it. You know, prior experience with him, that they have to scrutinize that identification testimony. If there's this whole issue of some concern about identification. We are talking about the comparison that was made, even though…[y]our claim was never that the police officer misidentified. Your claim was, isn't it, sort of that the police officer lied.

[DEFENSE COUNSEL:] Well, that is another issue.

[THE COURT:] Is it a misidentification?

[DEFENSE COUNSEL:] Seems to me, Judge. Some information has to be given about—

[THE COURT:] I will just read it. I am not saying I am giving it. All it does is outline the lighting, the—

[THE PROSECUTOR:] Doesn't really make sense for the—it's also for a stranger, isn't it?

[THE COURT:] He recognized him because he knows him.

[THE PROSECUTOR:] I will defer to the charge, obviously.

[DEFENSE COUNSEL:] I think as you know they have—there has been alteration on the identification charge where they mixed it all with **Kloiber** and—

[THE COURT:] That's the stranger identification. In other words, they're saying identification evidence is unreliable, and, so, if you—certain cases allow an expert to

testify. Regarding the cross-facial identification, things of the sort. But when you recognize someone, because you know them, you say, "I know them," that doesn't apply when they know the person. It doesn't.

The thing is now it's whether do you believe the police officer that he knows him.

[THE PROSECUTOR:]       Right.

[DEFENSE COUNSEL:]       I can't disagree with that.

I think the other factors involved here that creates the issue of identification; cause they're looking at the video, put aside the officer at the moment, the video is what is key for the Commonwealth's case.

[THE COURT:]       Maybe I will give some kind of instruction.

[THE PROSECUTOR:]       I strenuously object. The instruction is not necessary. Not only is it not necessary, there are no jury instructions that would apply to this particular circumstance. He's asking for a jury instruction unrelated type of circumstance. He want[s] to reargue his own closing.

[THE COURT:]       I understand it doesn't apply, but I will give you the benefit of the doubt. Remind them you have to judge the identification by the police officer.

[THE PROSECUTOR:]       I would object. We argued. I said it in my closing. It's not the same. You did give the instruction.

[THE COURT:]       I will reiterate it. How is this—I am not going to go through lighting and everything. It's a video. They know it's a video.

[DEFENSE COUNSEL:]       Okay.

[THE COURT:]       Stated obvious.

[DEFENSE COUNSEL:]       You're mentioning the police

officer. Are you—

[THE COURT:] I don't have to say that is the identification. He's the only witness to identify. You have to say there was an identification by the police officer. And, you know, even though he identified him, it's up to you to decide.

[THE PROSECUTOR:] I don't think that is—they can use him to help judge credibility and they judge—I don't think to give that instruction is—

[THE COURT:] It's not a *Kloiber* case.

[DEFENSE COUNSEL:] We can back off of that for a moment.

The other part sitting we have to re-emphasize that the jury, they have to determine what's on that video, not those markers or whatever else.

[THE COURT:] I told them; some emphasis on that. I will agree to that. We are good.

(N.T. Trial, 3/25/22, at 159-165). After this exchange, the sidebar discussion concluded. The court then issued a supplemental jury charge as follows:

[THE COURT:] One other thing I will add in.

During the trial you saw a video in this matter. Sometimes there was narration by the detective in the case. What you see in the video. You are the judge of the facts, so you make that determination. That is it.

(*Id.* at 165-66). After the court's supplemental instruction, Appellant posed no objection or requested any additional instruction for the jury. (*See id.*)

Here, the record makes clear that following the initial jury instructions, defense counsel requested a *Kloiber* charge. After a lengthy discussion with the parties concerning the propriety of the requested charge, the court

- 19 -

declined to give the specific **Kloiber** instruction, but the court agreed to re-emphasize to the jurors that they are to determine what the video evidence shows. Defense counsel made no objection to the court's statement that it would not issue the requested **Kloiber** instruction, and defense counsel also did not object following the court's supplemental instruction. Therefore, Appellant's second issue is waived on appeal.[5] **See Pressley, supra**; **Melton, supra**.

In his third issue, Appellant argues that the court improperly overruled his objection to the detectives' expressions of their disbelief in Appellant's account of events as well as their disbelief in Appellant's assertion of innocence. Appellant claims the prosecutor sought to introduce the detectives' statements from his videotaped interrogation[6] that "we believe it's you in the

_____

[5] In his reply brief, Appellant cites to mostly civil cases which purportedly stand for the proposition that this Court can overlook waiver where the trial court addressed the issue on the merits in its Rule 1925(a) opinion. (**See** Appellant's Reply Brief at 4-6). As these cases are not specific to the criminal context addressing the failure to object to a jury charge, they do not afford Appellant relief. We further note that in **Pressley**, our Supreme Court distinguished the rules governing issue preservation concerning a jury charge in the criminal and civil arenas. **See Pressley, supra** at 632 n.10, 887 A.2d at 225 n.10.

[6] The videotaped interrogation played for the jury is included in the certified record. On July 3, 2023, this Court granted Appellant's unopposed motion seeking to supplement his brief with transcribed excerpts of the videotaped interrogation. We made clear in our order, however, that we accepted the transcribed excerpts only for the purpose of aiding this Court's review of the videotaped interrogation, and to the extent that there are any inconsistencies between the transcript references and the video, the video controls.

[surveillance] video, we believe we have the right person, we believe it's you in the video." (Appellant's Brief at 53) (citing N.T. Trial, 3/24/22, at 35). Appellant claims the court admitted such evidence over defense counsel's objections, which "unleashed a torrent of impermissible opinion evidence from law enforcement, including direct accusations that [Appellant's] repeated insistence of innocence was nothing more than fabrication." (*Id.* at 53). Relying on *Commonwealth v. Kitchen*, 730 A.2d 513 (Pa.Super. 1999), Appellant insists that "[t]he detectives' repeated accusations in the face of [Appellant's] denials, delivered with such certitude, coupled with their expressions of incredulity, are the very type of statements that this Court has held must be excluded from a defendant's trial." (Appellant's Brief at 56). Appellant highlights that there were 14 accusations by police "repudiating [Appellant's] exculpatory statements by reaffirming their unshakable conclusion that he was guilty, and his story untrue." (*Id.*) Appellant maintains that "[i]n a close case like this one, where the single identification witness is viewing the same obstructed images that the jury is viewing, lobbing fourteen accusations of fabrication could never be deemed harmless." (*Id.* at 57). Appellant concludes the court's evidentiary ruling was improper, and this Court must grant relief. We disagree.

Our standard of review of a trial court's admission or exclusion of evidence is well established and very narrow:

> Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent

a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Montalvo*, 604 Pa. 386, 403, 986 A.2d 84, 94 (2009), *cert. denied*, 562 U.S. 857, 131 S.Ct. 127, 178 L.Ed.2d 77 (2010) (internal citations and quotation marks omitted). Further, our scope of review in cases where the trial court explains the basis for its evidentiary ruling is limited to an examination of the stated reason. *Commonwealth v. Stephens*, 74 A.3d 1034, 1037 (Pa.Super. 2013). "We must also be mindful that a discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." *Commonwealth v. O'Brien*, 836 A.2d 966, 968 (Pa.Super. 2003), *appeal denied*, 577 Pa. 695, 845 A.2d 817 (2004).

In *Kitchen, supra*, this Court considered the Commonwealth's appeal from an order granting in part the appellee's motion *in limine* to exclude at trial a videotape of her interrogation by police. In her motion *in limine*, the appellee had argued the videotape evidence "contained hearsay statements by police interrogators and that the police questioning of her contained 'inflammatory' information and involved an 'accusatory nature.'" *Id.* at 517. The trial court granted the motion in part, ruling that portions of the videotape evidence were inadmissible as part of the Commonwealth's case-in-chief, because they contained hearsay and inflammatory and prejudicial remarks by the police interrogators. *Id.* at 517-18. The Commonwealth declined the

court's invitation to redact the videotaped evidence. *Id.* at 517. Thus, the court barred portions of the video regarding police officers' statements to the appellee that "(a) she is going to be arrested for murder; (b) witnesses will connect [the a]ppellee to the murder; (c) [the appellee's co-defendant] was in police custody; (d) [the a]ppellee is lying to police and she is aware that she is lying; and (e) the police would not be accusing [the a]ppellee of murder and conspiracy if they did not have a solid case against her." *Id.* at 518. The court further excluded portions of the video where the appellee did not respond to the accusatory police questions concerning the appellee's participation in the crimes. *Id.*

On appeal, this Court affirmed in part and reversed in part the trial court's ruling. Relevant to our analysis of Appellant's issue, this Court agreed with the trial court's exclusion of several instances where the police, "either directly or indirectly, accused [the a]ppellee of lying." *Id.* This Court explained: "When the troopers stated to [the a]ppellee, 'You're lying,' or 'We know that you're lying,' or phrases to that effect, their statements were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial." *Id.* Thus, this Court held that the twelve accusations of lying and untruthfulness must be redacted from the videotaped evidence prior to their submission to a jury. *Id.* at 522.

This Court noted that there were also several instances when the

troopers asked the appellee whether she had lied about a particular fact and she responded; those inquiries did not need to be redacted because they were in question form, did not involve an opinion as to the truth or falsity of the appellee's statements or an opinion as to the appellee's guilt, and the appellee offered responses. *Id.* This Court further agreed with the trial court's exclusion of several instances of police questioning coupled with a lack of responses by the appellee, because those instances would constitute an improper reference to the appellee's pre-arrest silence. *Id.* In so holding, this Court explained:

> Evidence of a defendant's silence in refusing to deny guilt after an accusation of guilt has been made (often referred to as a tacit admission) is generally not admissible where the silence occurred while the defendant is in police custody because a contrary policy would effectively vitiate a defendant's constitutionally guaranteed Fifth Amendment right against self-incrimination. However, this [principle] of not allowing evidence of a tacit admission by the defendant does not extend to instances where the defendant does not choose to remain silent but instead volunteers responses to police questioning.
>
> Once a defendant chooses to make a response, that response, and the circumstances surrounding the response, are properly made available for the jury's consideration in evaluating the credibility of the verbal denial based on a contemporaneous non-verbal act.

*Id.* (quoting *Hawkins, supra* at 385-86, 701 A.2d at 509).

Thus, this Court made clear "that any accusatory statement made or question posed by police to [the a]ppellee, and [the a]ppellee's reaction and/or response to the statement or question, need not be redacted from the

videotape if [the a]ppellee responded, even if after a silent pause, to the statement or question." *Kitchen, supra* at 523 (citing *Hawkins, supra*).

Even where the admission of police accusatory statements is improper, relief is unwarranted where the error is harmless. *See Commonwealth v. Kratz*, No. 150 EDA 2020 (filed April 30, 2021) (unpublished memorandum), *appeal denied*, ___ Pa. ___, 266 A.3d 451 (2021) (holding admission of detectives' accusatory statements was harmless error). An error is harmless where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Williams*, 274 A.3d 722, 735 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, 290 A.3d 647 (2023) (internal citation omitted).[7]

Instantly, Appellant objects to the following 14 statements by police made during the videotaped interrogation:

> 1. Detective Burns: "You were picked up on surveillance footage."
>
> 2. Detective Burns: "I don't believe that we [have the wrong

---

[7] The Commonwealth agrees with Appellant that the challenged portions of the videotaped interrogation were inadmissible under *Kitchen* but insists that Appellant suffered no prejudice to warrant a new trial. (*See* Commonwealth's Brief at 14).

guy]."

3. Detective Burns: "I'm telling you that I know that this … is you, that's what I'm telling you [Appellant]."

4. Detective Burns: … "You were right on 62nd Street at this time."

5. Detective Burns: "I showed you the photo and you looked and you said no, that's not me, and I said it is you."

6. Detective Harkins: "We checked the cameras on 62nd Street …, and you were out there."

7. Detective Burns: …"I know that you were right there."

8. Detective Harkins: (in response to [Appellant's] statement that he does not wear hats) "Do you know how absurd that sounds?"

9. Detective Burns: … "[you are not] building a lot of points on your behalf" …

10. [Detective Burns:] … "You're a 25-year-old kid, I find it awfully suspicious that you wouldn't have a cell phone at some point."

11. Detective Burns: "Your story keeps evolving, changing, and everything else with your [phone] numbers."

12. Detective Burns: "Another reason why you would have something on your head – to cover up that thing on your head. That's exactly what I'm thinking."

13. Detective Harkins: "Do you remember the photograph that we showed you this morning of what we said was you, and you said I don't even own those clothes?" … "You couldn't possibly make the argument that these [clothes recovered from Appellant's home] are not the exact same clothes depicted in that video."

14. Detective Burns: "We're quite confident we have the right person here."

(Appellant's Brief at 54-56) (reformatted from brief; record citations omitted).

Our review of Appellant's interrogation confirms that the statements posed by the police in Appellant's interrogation were different than those deemed inadmissible in *Kitchen*. Unlike in *Kitchen*, the challenged portions of the police statements at issue here did not state "[y]ou're lying," or "[w]e know that you're lying," or phrases to that effect. *Compare Kitchen, supra* at 521-22 (discussing specific accusations of lying or untruthfulness that were inadmissible).[8] Rather, the police informed Appellant repeatedly that they believed Appellant was the person on the video surveillance (based on police identification of Appellant) and made statements confirming their position that Appellant was on the video in an effort to obtain an admission of guilt. Although Appellant maintains that the officers' repeated accusations **implied**

_____

[8] Specifically:

> [T]he troopers stated four times on Tape 1 that [the a]ppellee was "lying". On Tape 1A there were three instances, one at the beginning and two at the end of the tape. At the beginning of Tape 1A Trooper Schreiber stated, regarding Tape 1, "There were a lot of things we know were not true." At the end of Tape 1A the troopers stated, "This is not the story we've been getting from other people" and "This is something different from what you've said before." On Tape 2 there were five accusations of lying or untruthfulness: three were direct accusations and two involved indirect accusations. All of the aforementioned twelve accusations of lying and untruthfulness must be redacted from the videotapes prior to their submission to a jury.

*Kitchen, supra*.

that Appellant must be lying in his assertion of innocence, none of the challenged statements directly accused Appellant of lying or untruthfulness similar to the statements made in *Kitchen*.

Additionally, we note that Appellant did not remain silent when faced with any of the challenged police statements; instead, he repeatedly maintained his innocence. Thus, once Appellant chose to respond, his responses and the circumstances surrounding his responses were properly before the jury for consideration in evaluating Appellant's credibility. *See id.* Further, any challenged **questions** posed by police (as opposed to alleged accusatory statements) would not be inadmissible under *Kitchen*. *Id.*

To the extent the police indirectly commented on Appellant's truthfulness, we agree with the Commonwealth that such error was harmless. Here, the interrogating officers' protestations that Appellant was on the video were based on Officer Lamanna's identification of Appellant in the video. Officer Lamanna identified Appellant in the video at trial and was available for cross-examination.[9] Further, the court informed the jury multiple times throughout trial that they were the finders of fact, "so it doesn't matter what the detective believes he sees in the picture." (N.T. Trial, 3/24/22, at 138). (*See also* N.T. 3/25/22, at 165-66) (stating: "What you see in the video. You are the judge of the facts, so you make that determination. That is it"). We

_____

[9] We discuss the propriety of Officer Lamanna's identification of Appellant in our discussion of Appellant's fourth issue, *infra*.

will presume the jury followed the court's instructions. *See Hawkins, supra*.

Under these circumstances, any error in playing the videotaped interrogation

for the jury was harmless. *See Williams, supra*; *Kratz, supra*. Therefore,

Appellant's third issue on appeal merits no relief.

In his final issue, Appellant argues that the court improperly permitted

Officer Lamanna to identify Appellant from the video surveillance evidence.

Appellant asserts that Officer Lamanna did not base his opinion upon any

sensory or experiential observations particular to his acquaintance with

Appellant that distinguished Appellant from others in the population at large.

Rather, Appellant claims Officer Lamanna made observations of widely

applicable, common features, and had no insight to offer the jurors. Appellant

insists that Officer Lamanna imparted nothing to the jurors that they could not

see and fairly consider themselves. As such, Appellant maintains the officer's

testimony was not helpful to the jury in determining the critical fact in issue.

Appellant suggests that the officer's description of the person in the

video's long arms would be representative of any individual of great height.

Appellant further submits that the perpetrator did not even take short strides,

in contrast to the officer's testimony of Appellant's particular gait. Even if the

perpetrator did take short strides, allegedly similar to Appellant's gait,

Appellant posits "the fact of a short stride is a thin reed upon which to allow a

police officer to tell the jury that the person in the video is the defendant."

(Appellant's Brief at 63). Appellant concludes the court's admission of Officer

Lamanna's identification testimony was improper, and this Court must grant relief. We disagree.

Initially, we reiterate that the failure to make a timely and specific objection before the trial court at the appropriate stage of the proceedings will result in waiver of the issue on appeal. *See Tucker, supra*. *See also Commonwealth v. Cash*, 635 Pa. 451, 137 A.3d 1262 (2016), *cert. denied*, 580 U.S. 1161, 137 S.Ct. 1202, 197 L.Ed.2d 249 (2017) (explaining that appellant waives claim on appeal where objection raised at trial was different ground for relief than that raised on appeal).

Instantly, Appellant objected to any police identification of Appellant from the surveillance video prior to trial. (*See* N.T. Pre-Trial Hearing, 3/17/22, at 17). Specifically, defense counsel argued:

> The second issue we have is the testimony of police officers as to attempts to make identification. That is a little more crucial than what we are speaking about now, although both of them are extremely crucial, and that is the testimony of police officers.
>
> They have a limited purpose, nothing more. Remember, there is no layman identification of my client from any source, not even the information concerning the height and weight of the individual, any type of description.
>
> It doesn't even match my client and then the police officers come in and they look at the video and they say he is running that way. I saw this and, therefore, that must be him. I am objecting to all of that, Your Honor.

(*Id.*) Following argument from counsel and the court's viewing of the surveillance video, the court decided the identification testimony was

admissible. The court stated:

> Under the case law, [the prosecution] can do that because the video isn't clear. If he would have looked right up in the video, that would be different but the video isn't clear and this is a neighborhood that he hangs in and they are patrol officers. It will not be prejudicial in the sense they just know who hangs out in the neighborhood. They will not talk about prior crime or anything like that.
>
>           *    *    *
>
> They patrol and they can just say that they think it is him and then I can give a cautionary instruction but they have to have a basis for it. He is very tall.

(***Id.*** at 46-47). During trial, the court revisited Appellant's continued objection to the police identification testimony. (***See*** N.T. Trial, 3/23/22, at 2). Specifically, Appellant argued:

> As I informed the [c]ourt and the Commonwealth, Your Honor, I object to this police officer [Officer Lamanna] making an identification and indicating during the course of this video, the location of my client and where he is walking and as a result, Your Honor, that is for the jurors' determination, **not this particular officer, not because he is offering an opinion but because the best evidence is this video** and, more importantly, the features are going to be designated and shown on this particular video, so the jury can make its own determination.

(***Id.*** at 2-3) (emphasis added). The court overruled Appellant's objection. (***See id.*** at 3-5).

Instantly, the Commonwealth argues that Appellant waived this issue, where defense counsel confirmed he was not objecting because the officer was offering an opinion, but because the video is the best evidence in this case. (***See*** Commonwealth's Brief at 16) (citing N.T. Trial, 3/23/22, at 2-3).

Although the highlighted statement above might suggest that Appellant was abandoning any earlier objection in favor of limiting his objection to a violation of the "best evidence rule,"[10] in light of Appellant's earlier pre-trial hearing objection and the court's on-the-record discussion of same, we decline the Commonwealth's invitation to deem this issue waived on appeal.

Turning to the merits of this issue, Pennsylvania Rule of Evidence 701 provides:

### Rule 701. Opinion Testimony by Lay Witnesses

If a witness is not testifying as an expert, the testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701. "Generally, lay witnesses may express personal opinions related to their observations on a range of subject areas based on their personal experiences that are helpful to the factfinder." *Commonwealth v. Berry*, 172 A.3d 1, 3-4 (Pa.Super. 2017).

Under appropriate circumstances, this Court has upheld decisions to

---

[10] *See* Pa.R.E. 1002 (stating: "An original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise"). The comment to the Rule explains that this rule of evidence corresponds to the common law "best evidence rule." Pa.R.E. 1002, *Comment*.

allow police to offer lay opinion testimony. *See, e.g., **Commonwealth v. Palmer***, 192 A.3d 85 (Pa.Super. 2018), *appeal denied*, 651 Pa. 339, 204 A.3d 924 (2019) (holding admission of detective's lay opinion testimony identifying appellant as shooter in surveillance videos was proper because it was based on his perceptions and was helpful in allowing jury to reach clear understanding); ***Commonwealth v. Spencer***, 639 A.2d 820 (Pa.Super. 1994) (holding that admission of witness's opinion that gait of robber and gait of appellant were similar was proper); ***Commonwealth v. Hassinger***, No. 168 MDA 2020 (Pa.Super. filed July 9, 2021) (unpublished memorandum), *appeal denied*, ___ Pa. ___, 270 A.3d 431 (2021) (holding trial court did not abuse its discretion in permitting lay opinion testimony by law enforcement that defendant was person on surveillance video based on their interactions with him over years; lay opinion testimony is more likely to be admissible where surveillance evidence is of poor or grainy quality or where it shows only partial view of subject).

Here, Officer Lamanna testified that he has seen Appellant in the area of the 18th District "[i]n person, more than ten times; on social media, hundreds." (N.T. Trial, 3/23/22, at 20). The Commonwealth then played the surveillance video in front of the jury. The officer stated: "I believe that to be [Appellant] in the gray hooded sweatshirt, dark pants, black Timberland-style boots." (*Id.* at 26). Officer Lamanna testified that he identified the person in the video as Appellant "[b]ased on some of the facial features, the beard you

can observe, the way he walks, his height, especially." (*Id.* at 27). The officer also indicated that Appellant's arms hang low, below his waist. (*Id.* at 28). In discussing the way that Appellant walks, the officer stated: "He seems to take shorter strides given his height than you normally would expect and he kind of mills about, walks slowly for what you would expect [for a tall person]." (*Id.* at 29). The Commonwealth asked the officer: "[W]hat, if anything, about this particular clip reinforces your belief that the person we have been watching is [Appellant]?" (*Id.* at 33). The officer responded: "The same stride, the same length of arms, they way his arms hang low to the side." (*Id.*) The officer characterized Appellant's stride as "unique" to Appellant, given his height of six feet, seven inches tall. (*Id.* at 38-39). The officer also indicated that Appellant has a Superman logo on his forehead.[11] (*Id.* at 39). The officer also confirmed that he has previously spoken face-to-face with Appellant, where the officer was able to observe Appellant's facial features and "things like that[.]" (*Id.* at 40).

The trial court evaluated this claim as follows:

> In the instant matter, Officer Lamanna, who identified [Appellant] as the perpetrator in the surveillance video, knew him prior to the incident for a few years, and observed him many times in person on social media.
>
> In the context of this case, police officers were the only identification witnesses since the civilian witnesses were uncooperative. The court allowed Officer Lamanna to make

---

[11] A tattoo is not visible in the surveillance video due to the presence of a hooded covering on the shooter's head.

the identification based on his prior familiarity with [Appellant], since he was a patrol officer in the area and in the footage the perpetrator had his head covered with a hoodie. Upon identifying [Appellant], Officer Lamanna stated the basis for his identification as follows: "it was based on some of the facial features, the beard you can observe, the way he walks, his height, especially." N.T., 3/23/22, 25-27. The officer additionally identified [Appellant] by his gait, stating: "he takes shorter strides, walking slowly for what you expect, due to his height with his arms hanging below his waist."[5] N.T., 3/23/22, 28-29.

> [5] [Appellant] is six feet seven inches tall.

Officer Lamanna's identification testimony was admissible because the testimony was based on a prior knowledge of [Appellant], and the officer stated the basis of his identification which was [Appellant's] facial features, arm length, gait, and height. This identification was helpful in allowing the jury to reach a clear understanding. It bears noting that the jury was viewing the exact video from which the identification was made. Therefore, the jury was free to believe or disbelieve the testimony, and the officer was subject to cross-examination on his identification of [Appellant].

The court did not abuse its discretion by overruling trial counsel's objection to allowing a police officer to identify [Appellant] from a surveillance video.

(Trial Court Opinion at 24-25) (some internal citations omitted).

We agree with the court's analysis. Here, Officer Lamanna's identification of Appellant from the surveillance video was rationally based on his perception of Appellant from prior interactions; was helpful to the jury concerning the identification issue in the case, particularly where the video was not totally clear at times; and was not based on scientific, technical, or other specialized knowledge. **See** Pa.R.E. 701; **Hassinger, supra**. Upon our

review, we see no abuse of discretion concerning the court's evidentiary ruling.  **See Montalvo, supra**.  Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/14/2023